2022 IL App (1st) 190158
Opinion filed: February 24, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-19-0158

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 17711 |
| | ) | |
| STANLEY ALLEN, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     A jury returned verdicts convicting defendant, Stanley Allen, of the first degree murders

of Karif Thomas and Nakesha Johnson, but the jury also separately found in response to a special

interrogatory submitted for sentence enhancement purposes that he did not personally discharge

the firearm that proximately caused their deaths. The trial court sentenced defendant to a

mandatory term of natural life imprisonment. On appeal, defendant contends (1) the jury verdicts

finding him guilty of first degree murder but not guilty of personally discharging the firearm that

proximately caused the victims' deaths are inconsistent; (2) the trial court erred by failing to

respond to the jury's written question, propounded by it during its deliberations, regarding the

definition of the word "act" as contained in Illinois Pattern Jury Instructions, Criminal, No. 7.02

(4th ed. 2000) (hereinafter IPI Criminal 4th); (3) the trial court failed to properly admonish the

venire pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); and (4) the trial court

erred by admitting defendant's recorded phone call from jail to his mother and grandmother under

the tacit admission rule. For the reasons that follow, we reverse and remand for a new trial.

¶ 2    At trial, Antwon Fields, defendant's friend of about 10 years, testified for the State. Fields had a pending charge of possession of a firearm without a concealed carry license or valid Firearm Owners Identification (FOID) card and a prior conviction for retail theft.

¶ 3    On the morning of August 10, 2013, Fields (whose nickname is Man-Man) was "hanging out" with defendant, Thomas, and Johnson in the driveway of Thomas's house at 126th Street and Loomis Street. At about 2 a.m., Fields went to a liquor store with another person named Josh and purchased a pint of Hennessy. They returned to Thomas's driveway, and Josh left about a half hour later.

¶ 4    Fields continued to socialize with defendant, Thomas, and Johnson. Fields stated that he was positioned closest to the street, defendant was to his left, and Thomas was to defendant's left. Johnson was on the other side of the driveway. They were drinking and talking about their children and "getting along just fine." Fields stated that he was "buzzed" but was not drunk.

¶ 5    At about 3 a.m., Fields's girlfriend, Ashley Robinson, called and told him that she was getting off work and was driving over to pick him up. Fields saw Robinson's vehicle about three or four houses away, and he got up to walk to the automobile. Fields was also planning on giving defendant a ride back to his home, so he motioned to defendant that it was time to go. As Fields began walking, he heard a gunshot coming from close behind him, looked back, and saw that Thomas was "laid back" on the ground. About three seconds later, Fields heard a second gunshot from close behind him and saw a "quick flash." Fields ducked down and went to Robinson's vehicle to get away from the gunfire. Fields subsequently learned that both Thomas and Johnson had been shot and killed. Fields testified that, in his opinion, defendant "had to have been" the shooter because "nobody else [was] out there." However, Fields stated that he never saw defendant with a gun in his hand.

¶ 6    After Fields entered the passenger's side of Robinson's vehicle and they began driving, he saw defendant walking across the street. Fields told Robinson to stop the automobile, and he called to defendant to get in the vehicle. Fields explained that he called out to defendant because "he was like a brother to me," and Fields wanted an explanation for why defendant had fired the shots.

¶ 7    Soon after defendant entered the automobile, Fields saw a police vehicle pulling them over. Fields then told defendant to get out of the automobile. Defendant got out and "[took] off." Defendant had nothing in his hand when he exited the vehicle.

¶ 8    The officer approached the automobile and asked Fields why defendant had run away. Fields said that he did not know, and the officer "let [them] go." They drove to his sister Tameka's house, and Fields went inside and stored some bags of marijuana in a closet. Then they drove to his cousin Quinton's house, and Fields told him and Robinson about the shooting. Fields began receiving texts from some of his friends about the shooting, asking him how he was doing because they knew he had been in the area where the shooting occurred. Fields decided to go to the police to tell them what he knew. Robinson drove him to the police station where he gave a videotaped statement and spoke with an assistant state's attorney (ASA) about the shooting.

¶ 9    The parties stipulated that if called to testify, ASA Lisa Mateck would state that she and Investigator John Daley interviewed Fields at about 8 a.m. on August 10, 2013. Clips from the video recording of the interview were subsequently published to the jury. In the video, Fields tells ASA Mateck that after hearing the first gunshot and seeing Thomas lying dead, he saw defendant shoot Johnson "out of my peripheral [vision]."

¶ 10    Robinson testified that at about 3 a.m. on August 10, 2013, she got off work and called Fields to let him know that she was driving over to pick him up at Thomas's house. As she was driving up Loomis Street and approached the house, she heard two gunshots. She came to a stop

and saw Fields walking toward her automobile. He entered the passenger side. Then Robinson saw defendant walk over to her vehicle with a bottle in his hand and he entered the back seat. Robinson asked them if they had heard the gunshots, but neither defendant nor Fields responded. Instead, Fields told Robinson to take him to his sister Tameka's home.

¶ 11    Robinson began driving. A few moments later, a police officer activated her sirens to pull them over. When Robinson stopped her vehicle, defendant exited and ran away in the direction of a nearby hardware store. Robinson and Fields remained inside the vehicle. The officer pulled up alongside and asked Robinson why defendant had run away. Robinson responded that she did not know. The officer then spoke with another officer on her "walkie," after which she told Robinson that she was free to go.

¶ 12    Robinson drove to Tameka's house, where they stayed for only about two minutes. Then Robinson drove to Quinton's house where she heard Fields and Quinton discuss the shooting. A couple of hours later, Robinson drove Fields to the police station and dropped him off. About an hour later, Robinson returned to the police station and gave a videotaped statement.

¶ 13    Officer Asia Blackman testified that at about 3 a.m. on August 10, 2013, she was on uniformed patrol in a marked squad car in the area of 127th Street and Loomis Street. Her partner, Officer Jerald Nettles, was in a separate unmarked vehicle at that time. Officer Blackman was parked in a parking lot at 127th Street and Bishop Street when she heard two gunshots coming from somewhere north of where she was parked.

¶ 14    Officer Blackman left the parking lot and traveled north on Bishop Street. When she arrived at 126th Street and Bishop Street, Officer Blackman spoke with two people and then continued south on Loomis Street and saw Robinson's vehicle parked on the west side of the street. Officer

Blackman saw defendant run from the east side of the street toward Robinson's vehicle. Defendant entered the rear driver's side seat.

¶ 15     Officer Blackman activated her emergency lights and stopped the vehicle, at which point she saw defendant open the rear driver's side door, exit the automobile, and run across the street in the direction of a hardware store. Defendant was holding a bottle in his left hand and was holding up his pants with his right hand as he ran. Officer Blackman eventually lost sight of defendant.

¶ 16     Officer Blackman pulled up next to Robinson's vehicle and asked her why defendant had run away. Robinson said, "I don't know, I think he has some weed on him or something." Officer Blackman heard over the police radio that Officer Nettles was in distress and needed help, so she left to assist him. She drove to Ada Street, where she saw defendant and Officer Nettles wrestling in an alley. Officer Blackman exited her vehicle, went over to them, and helped pull defendant off Officer Nettles. The officers handcuffed defendant.

¶ 17     After defendant was handcuffed, Officer Blackman recovered from inside of his pants a Smith & Wesson .357 revolver with four live rounds and two spent cartridge casings in the barrel.

¶ 18     Officer Nettles testified that at about 3 a.m. on August 10, 2013, he was standing outside his unmarked police vehicle in the parking lot of a currency exchange at 127th Street and Bishop Street when he heard two to three gunshots. Soon after, he heard Officer Blackman radio that she had stopped a vehicle near 127th Street and Loomis Street and that one of the occupants, a black male who was wearing a white T-shirt and jeans, had run from the car in a southeasterly direction.

¶ 19     Officer Nettles subsequently saw a person (later identified as defendant) matching the clothing description running near Ada Street and 127th Street with a bottle in his left hand. Officer Nettles exited his vehicle, gave chase, and tackled defendant. They fought each other, and defendant rolled on top of Officer Nettles and grabbed his testicles. Officer Nettles struck

defendant on the left side of his face with the bottle he had been carrying and radioed for help. Officer Blackman responded and helped subdue defendant. After defendant was handcuffed, Officer Blackman recovered a revolver from him.

¶ 20    Officer Nettles and defendant were both transported to the hospital. At the hospital, a blood sample was taken from defendant and it showed that his blood alcohol level was 0.23.

¶ 21    Crime scene investigator Cary Morin testified that he received the firearm recovered from defendant and swabbed the grip and the inside of the barrel. Morin analyzed the firearm for fingerprints, but none were detected. DNA analyst Lyle Boicken examined the swabs from the gun grips and detected a mixture of DNA profiles from at least three people, but he was not able to separate the profiles for a comparative analysis. There was no human DNA detected on the swab from the barrel.

¶ 22    The medical examiner, Dr. Adrienne Segovia, testified that Thomas and Johnson each died from a single gunshot wound and that their manners of death were homicide. The gunshot to Johnson's head entered the left side of her face, below her nostril. Dr. Segovia noted stippling on Johnson's face, indicating that the bullet had been fired at close range. The gunshot to Thomas entered the left side of his neck and exited the right. Dr. Segovia also noted stippling on Thomas's face but it was "much fainter" than the stippling on Johnson's face.

¶ 23    Firearms expert Robert Hunton testified that the cartridge casings recovered by police were fired from the revolver recovered from defendant at the time of his arrest. The bullet recovered from Johnson's body came from the same revolver.

¶ 24    The trial court admitted into evidence a recorded six-minute phone call from the Cook County jail at 10:25 p.m. on August 12, 2013, between defendant and his mother and grandmother. The recording is contained in the record on appeal. During the recording, defendant, his mother,

and grandmother sometimes talk over each other, such that, during our initial listening, it was not always entirely clear who was speaking and what was being said. However, after listening to the recording multiple times, we have been able to identify each of the speakers and what each one of them was saying. We set forth the pertinent portion of the phone call[1]:

> "[DEFENDANT'S MOTHER]: You innocent, right?
>
> [DEFENDANT]: (silent pause followed by:) uhhhh…
>
> [DEFENDANT'S MOTHER]: Alright.
>
> [DEFENDANT]: Uh-huh.
>
> [DEFENDANT'S MOTHER]: Alright.
>
> [DEFENDANT]: Uh-huh.
>
> [DEFENDANT'S GRANDMOTHER]: Alright.
>
> [DEFENDANT]: Alright.
>
> [DEFENDANT'S GRANDMOTHER]: Love you baby.
>
> [DEFENDANT'S MOTHER]: Love you.
>
> [DEFENDANT]: I love you too.
>
> [DEFENDANT'S MOTHER]: Take care of—
>
> [DEFENDANT]: Momma, you know it wasn't nothing crazy though.
>
> [DEFENDANT'S MOTHER]: I got you. I got you.
>
> [DEFENDANT]: Alright, alright, alright.
>
> [DEFENDANT'S MOTHER]: Alright.

---

[1]The State provided the trial court with its own rendition of the phone call, which we find to be slightly inaccurate, as it omits one of defendant's responses of "uh-huh" during the course of the conversation.

[DEFENDANT]: Hey and one more thing, call E and tell him that Man-Man is trying to come to court on me on the 30th. That's their little statement that they was talking about.

[DEFENDANT'S GRANDMOTHER]: Right.

[DEFENDANT'S MOTHER]: Man-Man's trying to what?

[DEFENDANT'S GRANDMOTHER]: Go to court on him.

[DEFENDANT'S MOTHER]: Oh Man-Man?

[DEFENDANT'S GRANDMOTHER]: Yeah, he said call E and tell E that Man-Man is trying to go to court on him on the 30th.

[DEFENDANT'S MOTHER]: On E?

[DEFENDANT'S GRANDMOTHER]: Tell E that Man-Man is trying to go to court on Stanley on the 30th.

[DEFENDANT'S MOTHER]: Ok."

¶ 25    During closing arguments, the State argued that defendant personally fired the gunshots that killed Thomas and Johnson. The State ended its closing argument by playing the recording of the phone call between defendant, his mother, and grandmother. In his closing arguments, defendant asserted that it was Fields who shot the victims.

¶ 26    During the jury instructions, the court gave the jury IPI Criminal 4th No. 7.02, stating:

"To sustain the charge of first degree murder, the State must prove the following propositions:

First proposition: That the defendant performed the acts which caused the death of Karif Thomas; and

Second proposition: That when the defendant did so,

he intended to kill or do great bodily harm to Karif Thomas or another;

or he knew that his acts would cause death to Karif Thomas or another;

or he knew that his acts created a strong probability of death or great bodily harm

to Karif Thomas or another."

¶ 27    The court gave a similar instruction with respect to the death of the other victim, Johnson.

¶ 28    The court further instructed the jury that it would receive four verdict forms for the offense of first degree murder. The first verdict form reads that the jury finds defendant not guilty of the murder of Thomas. The second verdict form reads that the jury finds defendant guilty of the murder of Thomas. The third verdict form reads that the jury finds defendant not guilty of the murder of Johnson. The fourth verdict form reads that the jury finds defendant guilty of the murder of Johnson.

¶ 29    The court instructed the jury that the State has also alleged that while committing the murders, defendant personally discharged a firearm and that, "If you find the defendant is not guilty of the offense of first degree murder, you should not consider the State's additional allegations regarding the offense of first degree murder."

¶ 30    At the request of the State, the trial court also asked a "special interrogatory" of the jury to obtain a sentence enhancement under section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020))[2]:

"If you find the defendant is guilty of first degree murder, you should then go on

with your deliberations to determine whether the State has proved beyond a reasonable

---

[2]Section 5-8-1(a)(1)(d)(iii) provides that "if, during the commission of the offense, the person personally discharged a firearm that proximately caused *** death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020).

doubt the allegations that during the offense of first degree murder the defendant was armed with a firearm, and that during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused death to another person."

¶ 31 The court instructed the jury that it would receive four additional verdict forms in response to the special interrogatory. The first verdict form reads that the jury finds that, during the commission of the first degree murder of Thomas, defendant did not personally discharge a firearm proximately causing death to another person. The second verdict form reads that the jury finds that, during the commission of the first degree murder of Thomas, defendant personally discharged a firearm proximately causing death to another person. The third verdict form reads that the jury finds that, during the commission of the first degree murder of Johnson, defendant did not personally discharge a firearm proximately causing the death of another person. The fourth verdict form reads that the jury finds that, during the commission of the first degree murder of Johnson, defendant personally discharged a firearm proximately causing the death of another person.

¶ 32 During the jury deliberations, the jury submitted eight notes. The first two, submitted at 5:15 p.m. and 5:40 p.m. asked for certain exhibits. In response, the court sent some exhibits to the jury.

¶ 33 The third note, submitted at 5:46 p.m., stated, "Get clarification on the four separate charges. The two first degree murder, the two discharge of a weapon. Are they both inclusive?" In response, the court informed the jury that it had been instructed on the applicable law and to continue deliberating.

¶ 34 At 6:30 p.m., the jury submitted a fourth note requesting more evidence and exhibits and requested to listen again to the phone call between defendant, his mother, and grandmother. In

response, the court informed the jury that it would not receive the exhibits but it allowed the jury to enter the courtroom to listen to the phone call again.

¶ 35 At 8:07 p.m., the jury submitted a fifth note stating, "Define the following first proposition: Perform the *acts* which cause the death of." (Emphasis in original). The court instructed the jury, "I cannot define that for you. Continue your deliberations."

¶ 36 At 8:52 p.m., the jury submitted a sixth note requesting to view Fields's videotaped interview. The court allowed the jury to enter the courtroom to view the videotape again.

¶ 37 At 9:33 p.m., the jury submitted a seventh note stating, "Jury is deadlock 6-6." With the agreement of the parties, the court decided that it would keep the jury until 11 p.m. and then send it home for the weekend.

¶ 38 At 10:53 p.m., the jury submitted an eighth note stating, "Is acts defined as a broader interpretation and worded on page 17 of the instructions? Deadlocked!! Can we consider act as involvement?"

¶ 39 In discussing the eighth note with counsel, the court stated, "Quite frankly, I have no idea what that means." Defense counsel responded, "Sound[s] like some of them are kind of working on some kind of accountability theory." The court noted, "They certainly weren't instructed on any accountability theory." The prosecutor stated that page 17 of the instructions contained IPI Criminal 4th No. 7.02, which provided that the State must prove that defendant performed the acts causing the victims' deaths. The prosecutor stated that "act means actions." Defense counsel responded, "I think the answer to this question is no. It should be the usual common language."

¶ 40 The court stated its agreement with defense counsel as to how to answer the note and then proposed sending the jury home for the weekend and bringing it back Monday for the continuation of deliberations. The prosecutor responded, "That's fine." Defense counsel stated, "We agree to

that, too. I think we are vested in this jury." The court sent the jury home for the weekend but did not answer its eighth note regarding the definition of "acts."

¶ 41    The jury returned the following Monday and continued deliberating without ever having received an answer from the trial court regarding its eighth note. At 11:21 a.m., the jury returned two verdict forms finding defendant guilty of the first degree murders of Thomas and Johnson. The jury returned two additional verdict forms in response to the special interrogatory, finding that during the commission of the first degree murders of Thomas and Johnson, defendant did not personally discharge a firearm that proximately caused their deaths. The trial court denied defendant's posttrial motion and sentenced him to a mandatory term of natural life imprisonment.

¶ 42    On appeal, defendant first argues that his conviction for murder should be reversed and the cause remanded for a new trial because the jury's findings in response to the special interrogatory that he did not personally discharge the firearm proximately causing the victims' deaths conflicted with its general verdicts finding him guilty of first degree murder. Defendant's contention is that the State only charged him as a principal shooter, meaning that the jury's general verdicts of guilty necessarily means that it found he shot and killed the victims, which conflicts with the findings in response to the special interrogatory that he did not discharge the firearm and therefore did not shoot the victims. Defendant contends that these inconsistent findings cannot be allowed to stand.

¶ 43    Defendant's contention is without merit. Our supreme court has held that defendants cannot challenge convictions solely because they are legally inconsistent with acquittals on other charges. *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003). In so holding, the *Jones* court followed the United States Supreme Court in *United States v. Powell*, 469 U.S. 57, 62-67 (1984), which set forth several reasons for refusing to allow defendants to challenge convictions based on inconsistency: the inconsistent verdicts could be the product of jury lenity; in the face of inconsistent verdicts, the

reviewing court cannot know which of the verdicts reflects the jury's true intent; it would be unfair to allow defendant to challenge a guilty verdict on inconsistency grounds where the State is not similarly able to appeal an acquittal on those same grounds; and defendant can still challenge the sufficiency of the evidence, lending a check on jury irrationality.

¶ 44    We have utilized the *Jones/Powell* analysis when addressing (as here) inconsistencies between a jury's general verdict of guilty of first degree murder and its finding in response to a special interrogatory that defendant did not personally discharge the firearm causing the victim's death. We have held that such inconsistencies can stand for the same reasons articulated in *Powell* and *Jones*. See *People v. Alexander*, 2017 IL App (1st) 142170, ¶ 38; *People v. Ware*, 2019 IL App (1st) 160989, ¶ 52.

¶ 45    We have further held that since the State's purpose in asking the special interrogatory was to obtain a sentence enhancement under section 5-8-1(a)(1)(d)(iii) of the Code (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020)), we will "refuse to consider the answer to the 'special interrogatory' beyond the purpose for which it was asked—whether there could be a sentence enhancement." *People v. Jackson*, 372 Ill. App. 3d 605, 612 (2007). As such, an answer to a special interrogatory, which relates only to the issue of sentence enhancement and not to the issue of defendant's underlying guilt or innocence of the criminal charges against him, cannot "trump[ ] the verdict in criminal cases" regardless of any inconsistency between the answer to the special interrogatory and the general verdict (*People v. Reed*, 396 Ill. App. 3d 636, 646 (2009)).

¶ 46    For all these reasons, we reject defendant's contention that his conviction of first degree murder must be reversed based on the inconsistency between the general verdicts and the jury's responses to the special interrogatory brought for sentence enhancement purposes.

¶ 47     Next, defendant argues that the trial court erred by failing to answer "no" to the jury's eighth note asking whether when considering if the State proved that defendant performed the "acts" which caused the victims' deaths under IPI Criminal 4th No. 7.02, the term "acts" can be broadly interpreted as meaning "involvement." Defendant argues that this eighth note exhibited that the jury was wrestling with the question of whether it could find him guilty on an accountability theory, even though the jury was never instructed on accountability at trial. Defendant contends that by failing to answer "no" to the question of whether he could be convicted on an accountability theory, the court permitted the jury to convict him of first degree murder even though it found that he did not personally discharge the firearm. In other words, it convicted him on an accountability theory that was not pursued at trial.

¶ 48     Initially, the State argues that defendant acquiesced in the court's handling of the eighth jury note and therefore is estopped from arguing that the court should have answered the note in the negative. See *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (defendant's invitation or agreement to the procedure later challenged on appeal goes beyond mere waiver and amounts to an estoppel). We disagree. Review of the record shows that after the jury submitted its eighth note regarding whether it can consider defendant's "involvement" in the shooting as indicating that he performed the acts which caused the victims' deaths, the court engaged in a discussion with counsel during which defense counsel stated that the note indicated that the jury was "working on some kind of accountability theory" and that "the answer to this question is no." The trial court agreed with defense counsel that the answer to the eighth note was "no" but proposed sending the jury home for the weekend to get some rest. Defense counsel agreed to sending the jury home for the weekend, but he never stated that he had changed his mind regarding how the note ultimately should be answered nor did he make any statement acquiescing in any decision not to respond to

the note. On this record, we find that defendant is not estopped from arguing on appeal that the court erred by failing to respond to the jury's eighth note.

¶ 49    Generally, the trial court has the duty to provide instruction to the jury when it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). This is true even though the jury was properly instructed originally; if a jury makes explicit its difficulties, the court should resolve them with "specificity and accuracy." *Id.* at 229. If the jury question is unclear, the court has the duty to seek clarification. *Id.* The trial court's response to a jury question is reviewed for an abuse of discretion. *People v. Reid*, 136 Ill. 2d 27, 38-39 (1990). The failure to answer or the giving of a response which provides no answer to the particular question of law posed is prejudicial error. *Childs*, 159 Ill. 2d at 229.

¶ 50    There are certain circumstances, though, when the trial court may exercise its discretion to refrain from answering a jury question. Such circumstances include when the words used in the instructions have a commonly understood meaning and the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact or where the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another. *Reid*, 136 Ill. 2d at 39; *People v. Manning*, 334 Ill. App. 3d 882, 890 (2002).

¶ 51    None of these circumstances are present here, as the jury's inquiry involves a question of law, not fact, and the giving of an answer would have served the useful purpose of clarifying the jury's confusion on the point of law and would not have caused the court to express an opinion that would likely have directed a verdict one way or the other.

¶ 52    The State argues, though, that the word "acts" has a commonly understood meaning such that the court committed no abuse of discretion in declining to respond to the jury's eighth note regarding whether "acts" can be broadly interpreted as including "involvement." The State further argues that the trial court effectively answered the same question several hours earlier, when the jury submitted a fifth note stating, "Define the following first proposition: Perform the <u>acts</u> which cause the death of." (Emphasis in original.) In response to that note, the court instructed the jury, "I cannot define that for you. Continue your deliberations."

¶ 53    Contrary to the State's argument, the submission of the eighth note during the course of its lengthy deliberations shows that an answer was necessary because the jury was continuing to struggle with which "acts" the State must prove that defendant performed under IPI Criminal 4th No. 7.02. The jury was questioning whether the State was required to prove that defendant actually fired the weapons causing the victims' deaths, or whether the State was only required to prove defendant's "involvement" in the circumstances leading to their deaths. Neither the commonly understood definition of "acts" nor the court's response to the fifth note, in which it declined to define "acts," answered the question posed in the eighth note or clarified the jury's point of confusion so as to alleviate the court of its duty to provide further instruction.

¶ 54    A case cited by defendant, *People v. Morris*, 81 Ill. App. 3d 288 (1980), is instructive. In *Morris*, the defendant was charged with burglary after he was arrested for driving away from the victims' home with their stolen property in his possession. *Id.* at 289. At trial, evidence showed that the defendant's palm print was found on the living room window. *Id.* The investigating officer testified that the defendant stated that he and another man, Chris Armstrong, were at the scene of the burglary but that the defendant never went inside the home. *Id.* Instead, Armstrong went to the

rear of the home while the defendant waited. *Id.* Several minutes later, the defendant left the scene. *Id.*

¶ 55    The jury was given People's Instruction No. 10 (IPI Criminal 4th No. 13.21), allowing them to infer the defendant's participation in the burglary from his unexplained possession of recently stolen property. *Id.* The jury was not instructed as to accountability. *Id.* at 289-90. During their deliberations, the jury sent the judge the following note:

> " 'If a person comes into possession of property obtained illegally by another can he be presumed guilty of burglary even though he, himself, may never have illegally entered the building or removed the property?' " *Id.* at 290.

¶ 56    The judge answered:

> " 'Not a proper question! You must decide the case on the instructions as given.' " *Id.*

¶ 57    The jury convicted the defendant of burglary. *Id.* On appeal, the defendant argued that the jury's note evinced some confusion regarding his accountability if he had not actually entered the burglarized home. *Id.* The defendant contended that if the jury's verdict resulted in part from this confusion, then he was prejudiced by the court's refusal to respond to the note. *Id.*

¶ 58    We agreed, noting that since no instruction on accountability was given, the State was required to show that the defendant actually entered the victims' house. *Id.* This showing could be either by direct proof or by the inference contained in People's Instruction No. 10. *Id.* However, the jury's note clearly evidenced confusion concerning the inference permitted by People's Instruction No. 10 and the possibility of convicting the defendant on an accountability theory. *Id.* We held that "once the jury had exhibited confusion concerning the applicability of accountability to this instruction, it was reversible error for the trial court to refuse to provide a proper answer to the jury's query." *Id.* at 291.

¶ 59 Similarly, in the present case, the jury was not instructed on accountability, yet its eighth note (indicating that it was struggling with the definition of the word "acts" in IPI Criminal 4th No. 7.02 and was wondering if "acts" could be broadly interpreted to mean that defendant was guilty if he had any "involvement" in the victims' deaths) evidenced the possibility that it was considering convicting defendant on an accountability theory. Once the jury exhibited confusion concerning the applicability of accountability to this instruction, it was reversible error for the trial court to fail to provide a proper response to the jury's query. The proper response was "no," that the jury could not so broadly interpret the word "acts" in IPI Criminal 4th No. 7.02 so as to convict defendant on an accountability theory that was not pursued at trial. See *People v. Peoples*, 2015 IL App (1st) 121717 (where the jury sends a note inquiring about an accountability theory that was not presented at trial, the proper response is to inform the jury not to consider such a theory). As a direct result of the court's failure to so respond to the jury's eighth note here, the jury subsequently convicted defendant of murder while simultaneously finding that he did not fire the weapon that killed the victims (*i.e.*, the jury likely found that defendant was not a principal but instead was some type of accomplice accountable for the principal's shooting of the victims).

¶ 60 The State argues that while the inconsistency between the jury's finding of guilt of first degree murder and the finding that he did not fire the weapon that killed the victims *could* indicate that the jury found defendant guilty on an accountability theory, the possibility exists that the verdict can be otherwise explained as the product of juror lenity, compromise, or some other "unknowable" reason. Since we cannot know with absolute certainty that the jury convicted defendant on an accountability theory, the State contends that we cannot find any prejudicial error by the court's failure to respond to the eighth jury note. We disagree, as prejudicial error results not from the *certainty* that the court's failure to respond to the jury note caused it to convict

defendant on an accountability theory, but rather because the court's failure to answer the jury note left the door open for the jury to convict defendant on an accountability theory that was never argued at trial. See, *e.g.*, *People v. Flynn*, 172 Ill. App. 3d 318, 323 (1988) (where the court's refusal to explicitly answer the jury's questions "left the door open" for the jury to entertain improper inferences to resolve its confusion, prejudicial error resulted requiring a new trial).

¶ 61 *People v. Jaimes*, 2019 IL App (1st) 142736, cited by the State, is inapposite. In *Jaimes*, the jury convicted the defendant of first degree murder but acquitted him of aggravated discharge of a firearm. *Id.* ¶ 1. The jury also found that the State failed to prove that the defendant personally discharged a firearm that caused death. *Id.* On appeal, the defendant argued that the trial court erred in its responses to three jury notes sent to it during the deliberations. *Id.* The first note asked: " 'Can we find [the defendant] guilty of first degree but not guilty of discharging and aggravating?' " *Id.* ¶ 28. The trial court discussed the note with the parties, who were unclear as to its meaning. *Id.* Accordingly, the court responded to the jury with: " 'Please clarify your question.' " *Id.*

¶ 62 The jury sent a second note asking: " 'Please define what is intended as an "act" in first degree murder.' " *Id.* With the concurrence of the parties, the court instructed the jury: " 'You have received the evidence and the instructions. Please continue to deliberate.' " *Id.* ¶ 29.

¶ 63 The jury sent a third note asking: " 'Are each of the three charges independent of each other? If not, what charges must be in tandem?' " *Id.* ¶ 30. With the concurrence of the parties, the court instructed the jury: " 'You have received all of the evidence and the instructions. Please continue to deliberate.' " *Id.* ¶ 31.

¶ 64 The defendant argued on appeal that the trial court should have realized, based on the three notes, that the jury was asking to convict him on a theory of accountability despite not being

instructed on that theory of guilt and that the court should have informed the jury that it could not consider such a theory. *Id.* ¶ 56. We found no reversible error in the trial court's responses to the jury notes, finding that "after the trial court asked the jury to clarify its initial note, the jury responded by asking which charges were in tandem. This question juxtaposed with the jury's first and second note simply does not necessarily indicate that the jury was concerned about guilt by accountability." *Id.* ¶ 58.

¶ 65 By contrast, the jury's eighth note here regarding whether the word "acts" could be given a "broader interpretation" indicated that it was concerned about guilt by accountability, but (unlike *Jaimes*) the court did not ask the jury for clarification nor did it provide any other type of response. The trial court's failure to offer any response to the jury's eighth note indicating that it was considering convicting defendant on an accountability theory that it was not instructed on necessitates that we reverse and remand for a new trial. See *Peoples*, 2015 IL App (1st) 121717; *Flynn*, 172 Ill. App. 3d 318; *Morris*, 81 Ill. App. 3d 288.

¶ 66 We proceed to address some other issues raised by defendant that are likely to reoccur during retrial.

¶ 67 Defendant contends that the trial court erred during *voir dire* when it failed to properly admonish the jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Rule 431(b) states:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant

does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects."

*Id.*

¶ 68    Rule 431(b) requires that the court ask the potential jurors whether they understand and accept the enumerated principles, mandating a specific question and answer process. *People v. Wilmington*, 2013 IL 112938, ¶ 32.

¶ 69    Review of the record indicates that the trial court properly questioned the potential jurors as to whether they understood and accepted the first three principles. As to the fourth principle, the court admonished the potential jurors as to whether they understood and accepted that defendant had a right to remain silent and that he was not required to testify but failed to inquire as to their understanding and acceptance that defendant's failure to testify cannot be held against him. The failure to specifically question the potential jurors about their understanding and acceptance that defendant's failure to testify cannot be held against him constitutes noncompliance with Rule 431(b). *Id.*; *People v. Jackson*, 2016 IL App (1st) 133741, ¶¶ 42-43. Accordingly, on retrial, the trial court must ask the potential jurors not simply whether they understand and accept that defendant has a right to remain silent and not to testify, but whether they also understand and accept that if defendant does not testify it cannot be held against him.

¶ 70    Next, defendant contends that the court erred by admitting his recorded phone call from jail to his mother and grandmother as a tacit admission under Illinois Rule of Evidence 801 (eff. Oct. 15, 2015). Rule 801 defines hearsay as an out-of-court statement offered to prove the truth of the matter asserted and specifies that certain statements are not considered hearsay. One such nonhearsay statement is the statement of a party opponent, which includes "a statement of which

the party has manifested an adoption or belief in its truth." Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015). These adopted statements are called "tacit admissions."

¶ 71    The admissibility of evidence generally is within the discretion of the trial court and will not be reversed absent an abuse thereof. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 12. However, to the extent that admissibility of evidence requires the interpretation of a rule and its intended scope, our review is *de novo*. *Id.* Also, in deciding to admit the recording here, the trial court heard no live testimony on the issue but instead listened to the recording and determined that it was admissible under the tacit admission rule. As no live testimony was presented and we are reviewing the same evidence (the recorded phone call that is contained in the record), our review of the phone call and whether it constitutes a tacit admission falling within the scope of Rule 801 is *de novo*. See *People v. Flores*, 2014 IL App (1st) 121786, ¶ 35.

¶ 72    Under the tacit admission rule, defendant's silence may be introduced as a tacit or implied admission of his guilt if he remained silent in the face of an incriminating statement painting or portraying him as a participant in illegal and prohibited activity. *People v. Soto*, 342 Ill. App. 3d 1005, 1013 (2003). When an incriminating statement is made in the presence and hearing of defendant and the statement is not denied, contradicted, or objected to, both the statement and the failure to deny it are admissible as evidence of defendant's acquiescence in its truth. *People v. Ruiz*, 2019 IL App (1st) 152157, ¶ 35. The necessary elements for admissibility under the tacit admission rule are "(1) that the statement incriminates the defendant such that the natural reaction of an innocent person would be to deny it, (2) that the defendant heard the statement, and (3) that the defendant had an opportunity to reply or object and instead remained silent." *Colon*, 2018 IL App (1st) 160120, ¶ 18.

¶ 73    Several out-of-state jurisdictions have rejected the tacit admission rule. See, *e.g.*, *Jarrett v. State*, 453 S.E.2d 461 (Ga. 1995); *Ex parte Marek*, 556 So. 2d 375, 382 (Ala. 1989). Although the tacit admission rule remains valid in Illinois, we have noted our concerns with the inherently ambiguous nature of a defendant's silence in the face of an incriminating statement, and that such silence potentially can be motivated by many factors other than a sense of guilt. *Ruiz*, 2019 IL App (1st) 152157, ¶ 37. We have also noted that "[t]he tacit admission rule appears to be on particularly shaky ground when a defendant is in police custody and knows the police can hear his conversation" because in such a unique circumstance, he may not feel free to respond. *Id.* Accordingly, our supreme court has expressly held that

> "[w]hile the tacit admission rule obtains in this State, and the silence of a defendant in the face of an accusation of guilt may be shown at his trial as evidence of guilt, such evidence should be received with caution and only when the conditions upon which it becomes admissible are *clearly shown* to exist." (Emphasis added.) *People v. Aughinbaugh*, 36 Ill. 2d 320, 322-23 (1967).

¶ 74    In the present case, the conditions for admitting the recorded phone conversation between defendant and his mother and grandmother while he was in jail have not been clearly shown to exist. The conversation begins with defendant's mother questioning him, "You innocent, right?" to which defendant responds with a silent slight pause, followed by a long "uhhhh." Such a question by his mother was not an incriminating statement portraying defendant as a participant in illegal activity but rather it was an inquiry about whether he was innocent. The trial court determined that under these circumstances, the natural reaction of an innocent person would be to respond affirmatively and assert his innocence and since he did not immediately do so, the entire recording was admissible under the tacit admission rule. We disagree. Under the tacit admission

rule, a defendant's silence is only admissible if made in response to an incriminating statement that would cause an innocent person to *deny* it. In effect, the admission of the recorded phone conversation here between defendant and his mother and his grandmother flips the tacit admission rule on its head and allows for an inference of guilt from defendant's failure to immediately respond *affirmatively* to his mother's nonincriminatory question, "You innocent, right?" We decline to so expand the tacit admission rule, and given the lack of an incriminating statement here that would cause an innocent person to deny it, the conditions for the admission of the recording have not been clearly shown to exist and therefore on remand it may not be admitted into evidence.

¶ 75    Further, even if we *were* to expand the tacit admission rule to allow for the admission of a defendant's silence in the face of a nonincriminatory question about his innocence, the recorded conversation would be inadmissible because defendant did not, in fact, remain silent, after his mother asked him, "You innocent, right?" Rather, after an initial silent pause, defendant said "uhhhh." His mother than said, "Alright," and defendant made an *affirmative* sound, "Uh-huh." His mother said "alright" again, and defendant again responded affirmatively, "Uh-huh." His grandmother then spoke up and said, "Alright," and defendant said, "Alright."

¶ 76    The trial court found that defendant's responses of "uh-huh" are "what everybody associates with a yes." However, the court found "that yes came four seconds too late," and that defendant tacitly admitted his guilt by not immediately saying "yes," or "uh-huh," in response to his mother's question, "You innocent, right?" We disagree, as our review of the recorded conversation shows a freewheeling discussion in which the parties talk over each other and where defendant's multiple affirmative responses of "uh-huh" at least arguably were made in response to his mother's question regarding his innocence. In the absence of a clear showing that defendant

remained silent in the face of his mother's question about his innocence, the necessary elements for admissibility under the tacit admission rule have not been met.

¶ 77    Further, the circumstances surrounding the placing of the phone call also militate against application of the tacit admission rule here. Specifically, defendant placed the phone call from the Cook County jail following his arrest and receipt of *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and the call began with the following clearly audible warning to its participants: "This call may be monitored and recorded. Your use of the institutional telephone constitutes consent for this monitoring and recording. This call is subject to recording and monitoring." Given that defendant was in jail at the time of the call and that he previously had been informed of his right to remain silent and that any statement could be used against him and he also was made aware that jail officials were listening to and recording his conversation, he may not have felt as free to respond to his mother and grandmother as he would if the conversation had taken place outside of such a setting.

¶ 78    *Ruiz*, 2019 IL App (1st) 152157, is informative. In *Ruiz*, we found that the defendant's failure to deny an incriminating statement was not admissible under the tacit admission rule because the statement and the defendant's response were made while he was under arrest and in a room at the police station and knew that an officer could hear him. *Id.* ¶ 38. We cited McCormick on Evidence: " '[T]he fact that the police are present when an accusatory statement is made may constitute a critical circumstance that eliminates the naturalness of a response.' " *Ruiz*, 2019 IL App (1st) 152157, ¶ 38 (quoting 2 Kenneth S. Broun *et al.*, McCormick on Evidence § 262, at 308 (7th ed. 2013)). We noted that "many arrested people know, even without *Miranda* warnings, 'that silence is usually golden.' " *Id.* (quoting *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir. 1976)).

We held that "defendant's surroundings militate against applying the tacit admission rule to the specified statements." *Id.* ¶ 39.

¶ 79    Similarly, in the present case, defendant had been arrested and given *Miranda* warnings. He was in custody in the Cook County jail when the call was made, and he knew that it was being recorded, all of which discourages application of the tacit admission rule here.

¶ 80    Next, defendant argues that the trial court erred by admitting defendant's statement to his mother, at the end of the recorded conversation, in which he asks her to "call E and tell him that Man-Man is trying to come to court on me on the 30th. That's their little statement that they was talking about." The State argues that the statement was admissible because it shows that defendant was trying to get E to intimidate Fields (whose nickname was Man-Man) to prevent him from testifying. A defendant's attempt to intimidate a potential witness is admissible to show his consciousness of guilt. *People v. Smith*, 141 Ill. 2d 40, 66 (1990). Our review of the admissibility of defendant's statement is *de novo* because no live testimony was presented and we are reviewing the same evidence (the recorded phone call) that the trial court reviewed in determining whether defendant's statement was admissible to show his attempt to intimidate a witness. *Flores*, 2014 IL App (1st) 121786, ¶ 35.

¶ 81    Our review of defendant's statement to his mother shows no *explicit* indication that he wanted E to intimidate Fields; in fact, during the brief statement, defendant never identifies E's relationship to Fields, nor does he clearly convey what he intends for E to say or do with the information that Fields was "trying to come to court on me on the 30th." In their responses to defendant's statement, neither his mother nor his grandmother provide any indication of an awareness that defendant's request to call E was meant for him to intimidate or threaten Fields. The State's argument for admissibility operates, then, on an *assumption* that defendant wanted E

to threaten and intimidate Fields to keep him from testifying; however, our supreme court has held that evidence that depends on unproven assumptions is inadmissible. See *People v. Barrow*, 133 Ill. 2d 226, 262 (1989) (letters that defendant sent to his brother indicating his dislike of a prosecution witness were inadmissible, where the State's argument for admissibility centered on its unproven assumption that the letters indicated defendant's intent for his brother to intimidate the witness). Accordingly, on retrial, defendant's statement to his mother regarding E and Man-Man may not be admitted into evidence.

¶ 82    For all the foregoing reasons, we reverse and remand for a new trial. We find that for purposes of the remand, a retrial in this case is not barred by the double jeopardy clause as the evidence presented at defendant's original trial was sufficient to prove him guilty of first degree murder beyond a reasonable doubt. See *People v. Lopez*, 229 Ill. 2d 322, 366-68 (2008) (indicating that the double jeopardy clause does not prohibit retrying a defendant whose conviction has been negated due to an error in the proceedings leading to the conviction unless the evidence presented at the original trial, viewed in the light most favorable to the State, was insufficient to sustain a conviction).

¶ 83    In so finding, we acknowledge the somewhat unusual procedural posture of this case, in which the State charged defendant with first degree murder as the principal shooter and the jury convicted him but separately found in responses to the special interrogatory (for sentence enhancement purposes) that he did not personally discharge a firearm proximately causing the victims' deaths. As discussed earlier in this opinion, the jury's responses to the special interrogatory related only to defendant's sentence enhancement and not to the general verdicts of guilt and, as such, those responses have no bearing on the State's ability to retry him for first degree murder on the same basis as in the original trial. See, *e.g.*, *Peoples*, 2015 IL App (1st) 121717 (we

reversed and remanded due to the trial court's error in responding to a jury note, and further held that the inconsistency between the finding of guilt and the finding made for sentence enhancement purposes created no double jeopardy impediment to the State's ability to retry him on the same basis as in the first trial).

¶ 84     However, as the jury specifically found against the State on the sentencing enhancement issue, the double jeopardy clause precludes the State from again submitting a special interrogatory on retrial to obtain a sentence enhancement. See *Currier v. Virginia*, 585 U.S. ___, ___, 138 S. Ct. 2144, 2158 (2018) (the issue preclusive aspect of the double jeopardy clause prohibits the State from relitigating issues necessarily resolved in defendant's favor at the earlier trial).

¶ 85     Reversed and remanded.

**No. 1-19-0158**

| | |
|---|---|
| **Cite as:** | *People v. Allen*, 2022 IL App (1st) 190158 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-17711; the Hon. Allen F. Murphy, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Michael Gomez, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David H. Iskowich, and Tyler J. Cox, Assistant State's Attorneys, of counsel), for the People. |