2022 IL App (1st) 200072
No. 1-20-0072
Opinion filed May 20, 2022

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 16880 |
| ROBERT SERRITELLA, | ) ) | The Honorable Lauren G. Edidin, |
| Defendant-Appellant. | ) | Judges, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice Pierce concurred in the judgment and opinion.
Justice Mikva specially concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Robert Serritella, was convicted after a 2019 bench trial for the first degree murder of 15-year-old David Chereck that occurred 27 years earlier. In 1992, the victim was found strangled to death in Linne Woods, which is part of the Cook County Forest Preserve. Defendant received a 45-year sentence that, because of the date of the offense, was eligible for day-for-day good-time credit.

¶ 2        No physical or DNA evidence connected defendant to the 1992 murder. The State's case consisted largely of defendant's own statements, the statements of jailhouse informants,

and circumstantial evidence. The State's theory of the case was that defendant strangled the victim after the victim refused to perform oral sex.

¶ 3    On this direct appeal, defendant does not challenge his 45-year sentence and does not claim that the evidence against him was insufficient. Rather, defendant claims that the trial court erred in admitting certain exhibits and statements that, he argues on appeal, were irrelevant, hearsay, unreliable, or all three. The State argues that, since this was a bench trial, we must presume that the trial court, as fact finder, considered only competent evidence and, if the evidence was admitted for a limited purpose, that the trial court considered it only for that limited purpose. However, the State does not claim that any of the issues that defendant now raises on appeal were forfeited. Thus, if we find error, the State will have the burden on appeal of proving that the error was harmless beyond a reasonable doubt.

¶ 4    For the foregoing reasons, we do not find error and affirm defendant's conviction.

¶ 5                                  BACKGROUND

¶ 6    The State called 15 witnesses over three days of trial. Without "a smoking gun," the State's case relied principally on a web of overlapping and interlocking details provided by a number of different witnesses. Thus, we provide the witnesses' testimony in the detail as required to understand both the State's case and defendants' attacks on inconsistent details.

¶ 7    The State's evidence at trial established that, on January 1, 1992, defendant was 49 years old, 6 feet tall, and 188 pounds, while the victim was 15 years old and 4 feet, 11 inches, tall. The State's first witness was Esther Chereck, the victim's mother, who testified that, in January 1992, the victim was a high-school sophomore who had practiced "karate for most of his young life," earning a brown belt. On January 1, 1992, after a family dinner at home, the victim said that he was off to meet some friends and go to a bowling alley on Oakton Avenue

in Skokie. The victim was wearing what he usually wore, which was black pants, black gym shoes, a white T-shirt, and a black jacket. When Chereck realized, after she woke up at five the next morning, that the victim was not home, she contacted the police department.

¶ 8        Chertek testified that, over 20 years later, on June 28, 2013, at approximately 4 p.m., she received a phone call from defendant, who identified himself by his first and last name. She received the call on the published landline number for her house, where she had lived continuously since before the murder. Defendant stated that he was calling from California, and he asked if she was the victim's mother, and if "there was any progress in the case." Defendant stated that "they thought he was a suspect, but he was really a witness." After the call, Chertek wrote down defendant's number, which appeared on her caller ID, and contacted Sergeant Larry Rafferty of the Cook County Sheriff's Police Department.

¶ 9        Chertek testified that, on July 4, 2013, police installed a recording device on her phone, and she called defendant's number and left a message on his voicemail, asking him to call her back. On July 7, 2013, defendant called her back and they had a 15-minute conversation, which was recorded. The trial court admitted, over defendant's objection, a transcript and recording of the call.

¶ 10        At the start of the call, defendant stated that he was calling from his church and that he was "sitting here with my Christian family."[1] Defendant stated that he could tell her only what he had already "reiterated several times to the police." Defendant stated that he saw "your son *** waiting on some road in the forest preserve district," just before sunset, and that, as defendant was driving by at "forty miles per hour," defendant saw the victim wave. Defendant

---

[1]Later at trial, the State called a witness who was a member of defendant's church and who had been present when defendant called the victim's mother. *Infra* ¶ 37.

3

stated that, although he told the police it was 7 p.m., he now thought that it was earlier. Chertek replied that she was confused by that because, earlier, her son was having dinner with her. Defendant replied then maybe it was not her son. Defendant stated that he observed "this boy" being "picked up" and entering a white car. Defendant stated that the white car pulled up next to defendant's vehicle while the two cars were both waiting at a traffic light and then the white car turned into the park while defendant drove on. Defendant stated that the other driver was about 40 years old, with bushy hair and sideburns, heavy-set, and smoking a fat cigar. Defendant told the police that the other car was a white Cadillac with a license plate number containing the letters "VC" and two sixes. Defendant stated that, later that same evening, as defendant was entering a 7-Eleven store, defendant thought he saw "the same boy" exiting the store.

¶ 11        During the call, the victim's mother stated: "I—just have a gut feeling that—I just wish I knew why you did it. I think you did it and I wanna know why. I don't wanna die in my grave and not know what happened to my son." (This statement by the victim's mother is the subject of an issue on appeal.)[2] After a pause, defendant asserted: "I didn't do it. I didn't know your son." After some more conversation, the victim's mother stated that she was going to give defendant's number to the police who would call him if they had more questions.

¶ 12        The next witness, Brian Murphy testified that, in January 1992, he was 15 years old and friends with the victim. On the evening of January 1, 1992, he planned[3] to meet up with the victim, as well as their other friends: Erin Christianson, Paul Mihelic, and Mike Jameson. Murphy testified that the boys stayed at a bowling alley for about an hour. The others wanted

_____

[2]The State argued in its rebuttal closing at trial that the pause showed consciousness of guilt by defendant, despite defendant's immediately ensuing denials. *Infra* ¶ 104.

[3]Murphy did not specify a time for the plans or other events that evening.

to go to a movie, but Murphy did not, so he went home. However, the other boys later stopped by Murphy's house to see if he wanted "to go back out and maybe to Lorel Park." But his mother said no, so he stayed home.

¶ 13        Murphy testified that, "[s]omewhere around" the time of the victim's death, Murphy was walking home "and a white car ** pulled up by me, a sedan, and someone yelled[,] get over here." Instead, Murphy ran. Murphy did not recall if this event occurred before or after the murder, but it definitely did not occur on the day of the murder. Murphy thought that he had provided this information in 1992, but he did not remember seeing it in the police reports. The police interviewed him again in 2013. On cross, the defense asked if Murphy first informed the police about the white vehicle during the 2013 interview; and Murphy replied: "If that's what the reports says then, yes."

¶ 14        Paul Mihelic testified that, in January 1992, he was 15 years old and friends with the victim. On January 1, 1992, he had plans to meet up with the victim, Murphy, Christianson and Jameson at some time after 7 p.m. After meeting up, the five of them spent approximately an hour at a bowling alley and, from there, headed to Lorel Park. They left the bowling alley between 8:30 p.m. and 9 p.m. and it was approximately a one-mile walk to Lorel Park. While Milhelic was on the swings, he noticed a white car pull up "rather suddenly." The car was American-made, from the 1980s, and "boxy." The car parked for several minutes and then left. Approximately 15 to 20 minutes after the white car left, Milhelic left the park at around 9:30 p.m. with the victim, Christianson, and Jameson. "From what [Milhelic] recalled," Murphy had left earlier than the rest of the boys to head home. The victim, Milhelic, Christianson, and Jameson walked to Jameson's house, and Jameson went home; then the remaining boys walked to Christianson's house. Milhelic, who had a 10:30 p.m. curfew, entered the Christianson house

to check the time and Milhelic recalled that it was 10:04 p.m. on a digital clock. The victim also checked the time and left immediately. Milhelic stayed a few minutes and then left.

¶ 15     Milhelic testified that, on his way home, he stopped at a 7-Eleven at Lincoln Avenue and Gross Point Road. Just before stopping at the 7-Eleven, and as he was walking north on Gross Point Road, Milhelic observed the victim "walking down Harms Road by himself in the middle of the street." Milhelic recognized the victim by "[h]is winter coat, his scarf, his walk." The victim was heading in the direction of the victim's house, which "would have been another ten or 12 minutes" away. Then Milhelic glanced in the 7-Eleven to see if anyone he knew was inside there playing video games. Not seeing anyone, Milhelic continued walking home. The last time Milhelic saw the victim it was "approximately 10:10 p.m., 10:15 at the very latest."

¶ 16     On cross-examination, Milhelic was asked, "you didn't tell the police at that time on January 2nd *** that you had seen a white car at Lorel Park, did you?" Milhelic replied: "If that's what the record shows, evidently, I didn't disclose that at that time or failed to remember it that day." Milhelic testified that he did not recall going to the movie theater, stating that he did not deny that it happened but that he did not remember it.

¶ 17     On cross, Milhelic was asked, whether on January 9, 1992, he told the police that, after the group departed from Lorel Park, Jameson left the group to go home, then the victim left the group and walked down Gross Point Road toward his home, and Milhelic and Christianson went to Christianson's house to check the time. Milhelic replied: "If that's what the document says, that's what I told them."

¶ 18     Next, Erin Christianson testified that he was 15 years old in January 1992 and was friends with the victim. On the evening of January 1, 1992, he was with the victim and the other boys at a bowling alley for about an hour. After they left the bowling alley, they headed

6

to Lorel Park, but Murphy had to leave early to go home. At approximately 9:30 p.m., the boys were hanging out at the jungle gym, slides, and swings. While they were at Lorel Park, a white car pulled up in front of the basketball court and then left. The boys were in Lorel Park for 15 or 20 minutes. At some point, they went to see if Murphy could come out again, but Christianson could not remember if that was before or after they went to Lorel Park. Murphy could not come out. Eventually, Jameson went home and the victim walked down Gross Point Road toward his home. At that point, only Milhelic was left with Christianson and, when they arrived at Christianson's house, they checked the time, and it was 10:04 p.m. on the digital microwave clock. Milhelic said that he had to get home and left immediately. The last time that Christianson saw the victim, it was close to 10 p.m. and the victim was heading down Gross Point Road.

¶ 19　　　　On cross, Christianson acknowledged that the police report that detailed what he told them in 1992 did not refer to a white car. Christianson did not recall telling the police in 1992 that he had observed a brown Cadillac that sped off, after the boys left the bowling alley, and that the driver was a white male, approximately 24 years old, with a brown or blonde beard who cursed as he passed them. However, Christianson said that, "if that's what the report says, that's what I told them at the time."

¶ 20　　　　On cross, Christianson also acknowledged that, on January 2, 1992, the police came to his home and took possession of a pair of black Nike Air Jordan gym shoes. On redirect, Christianson clarified that the brown vehicle was a different vehicle than the one he had observed at Lorel Park.

¶ 21　　　　The State's next witness, T.C. testified that he turned 17 on October 29, 1991. During 1991, he attended Lane Tech High School. One day, when he was walking home from school,

7

carrying his backpack, he was flagged down by a white man in a white car, approximately a block from his school. The car was a four-door, "boxy," white car with a red interior; and the man, who T.C. later identified as defendant, was 45 to 50 years old. After T.C. approached defendant's car, defendant asked T.C. if he had "a boyfriend or a girlfriend." Defendant informed T.C. that he was scouting possible locations in the neighborhood to open a video arcade, and he handed T.C. a business card with his name, two telephone numbers, and the phrase "Let's Come Together." T.C. recalled that the name on the card was "Ricco or Rocco." At some point, T.C. called him, and defendant said that he had been married to a Black woman and that he was bisexual but he preferred "boys." T.C. spoke to defendant between 15 and 30 times in late 1991. Although T.C. never had a sexual relationship with defendant, defendant threatened to tell T.C.'s mother that they were having one.

¶ 22    T.C. testified that their conversations were sexual in nature. Defendant asked for photos of T.C. and talked about sexual matters that defendant was "into," such as "S and M" and "restraints." T.C. recalled that defendant "talked about going to forest preserves to have sex. He talked about strangulation [and] auto asphyxiation." Defendant stated that he had been to the forest preserves before, with other boys, and that he had done "[t]he things that we talked about." Defendant asked T.C. if he had "ever been choked out before" and stated that strangulation during masturbation heightened the orgasm. Defendant said that he had done this before, and he suggested doing it with T.C. When these conversations began, T.C. was 16 years old, and defendant knew how old T.C. was because T.C. told him.

¶ 23    T.C. testified that they had a "system" for phone calls. If defendant called T.C.'s home and anyone else answered, defendant would hang up and T.C. would call him back. No one in T.C.'s family knew that he was having these conversations. At some point, T.C. "begged and

pleaded" with defendant to stop calling because the conversations were "unnerving" and "becoming increasingly bizarre." Defendant stated that he was worried about T.C.'s contacting the police. This concern "empowered" T.C. and made him feel "braver" about ceasing contact. T.C. ceased communicating with defendant but still received hang-up calls.

¶ 24    T.C. testified that, on March 28, 1992, the police came to his home to speak to him with his mother present. T.C. did not tell the police at that time how defendant obtained T.C.'s number or that they engaged in phone sex, "[b]ecause I could not have made that admission in front of my mother." By "phone sex," T.C. explained that he meant that they "would have sexual discussions and masturbate." T.C. identified the inscription on a stamp as being the same inscription on the card that defendant had handed T.C. On the stamp, the letters appeared backward, but they set forth "Ricco Rocco" with phone numbers and the phrase "Let's Come Together."[4]

¶ 25    On cross, T.C. testified that his first contact with defendant was in September 1991 when T.C. was still 16 years old, and that they had approximately two months of phone conversations. T.C. and defendant never went to the forest preserve, and T.C. never sent defendant nude photos of himself. After defendant agreed that he would not contact T.C., T.C. "received hang-ups for quite a long time after that," but T.C. "never spoke to him again." T.C. did not recall telling the police that defendant did not call him after agreeing not to contact T.C.

¶ 26    Carla Afini testified that, in 1992, she was a detective with the Cook County Forest Preserve Police Department. On January 2, 1992, she went to Linne Woods, where a body had

---

[4]A subsequent witness identified the stamp as a stamp retrieved from defendant's storage area. *Infra* ¶ 28.

been found. After she arrived, she observed that the victim was lying on his side, wearing a white shirt, black pants and socks, but no coat or shoes, and that he had a black scarf tied around his neck. The scarf was "tied very tightly" and was "double knotted in the back." The victim's arms were in front of him, and his back pants pocket was inside out. No shoes or jacket were recovered from the area. At the time, the weather was "in the 30's, and it was drizzling on and off" and "pretty damp." An examination of the victim's face revealed blood "through the nose and mouth" and some bruising. Afini testified that the victim's body was found 303 feet from Austin Avenue. McVicker Avenue and Austin Avenue both run north-south, with Austin Avenue east of McVicker Avenue, and a north-south alley running between the two avenues.[5] Near where the body was found, McVicker Avenue dead-ends into the park. The police were able to identify the body because his wallet contained his library card.

¶ 27        Afini was informed, prior to March 7, 1992, that defendant had phoned the police stating that he had seen the boy entering a white car. The police tried to contact defendant but could not reach him. After finding out where defendant lived, officers sat outside defendant's known residence on Touhy Avenue in Park Ridge, but they did not see him. On March 7, 1992, the police contacted Donald Barry Sr., who was the property manager of the building where defendant lived. After speaking with Barry Sr., the police spoke to Donald Barry Jr. of Barry Realty on March 10, 1992, and subsequently obtained a search warrant for defendant's apartment and storage area. Afini was part of the team that executed the search warrant on April 1, 1992.

---

[5]The location of the alley is significant because subsequent evidence establishes that a white Chrysler exited the alley during the night of the murder (see stipulation described *infra* ¶ 69) and that defendant was driving a white Chrysler during January 1992 (*infra* ¶¶ 31, 64).

¶ 28    Afini testified that, from the storage area, the police recovered "cancelled checks, utility bills, vehicle identifications, a piece of paper that had a profile regarding boys, and *** a stamp." Afini identified a cancelled check with defendant's name preprinted on it; a receipt, dated December 3, 1991, for $25 received from defendant at his address on Touhy Avenue; a vehicle identification card with defendant's name on it; a passport photo of defendant; a stamped card with "RICOROCO," phone numbers, and the phrase "Let's come together"; and the stamp for what was stamped on the card. Lastly, Afini identified a yellow piece of paper that the police found inside an envelope, The paper was handwritten and entitled "Boy profile for exploitation," and it listed certain characteristics. All of these items, including the "profile" list, were found together in the storage unit.

¶ 29    The handwritten profile list stated:

"—Between 8-17 years old.

—An underachiever in school or home.

—Came from a home where parents were absent either physically or psychologically.

—Has no strong moral or religious obligations.

—Usually had no record of previous delinquency.

—Suffered from poor sociological development."

The list is the subject of an issue on appeal.

¶ 30    The vehicle identification card was for a white 1983 Chrysler New Yorker four-door sedan. The card listed defendant's first and last name and an address in Park Ridge. The card stated that it was issued on August 9, 1991, and expired in August 1992.

¶ 31    Robert Fox testified that, in January 1992, he was an auto mechanic and that he had been employed with a car repair shop in Glenview for the 10 years prior to 1992. On January

9, 1992, he worked on a 1983 Chrysler New Yorker brought in by defendant and was told that it was defendant's mother's car.[6] At 6:45 a.m., Fox's boss informed him that defendant was anxious to head to California and needed the repair done immediately. Examining the vehicle, Fox observed that "a constant-velocity joint boot" (CV boot) was torn and grease was leaking out of it, and that "coating on the underneath of the vehicle had been scratched off." While the vehicle was up on the rack, defendant brought the scrape to Fox's attention, and Fox replied that he would spray paint it, which he did. Defendant said that the CV boot was torn when he went over a curb, and Fox thought that was "unlikely" and suggested that "maybe there was something sticking up in the road when you went over the curb." Fox testified that the damage to the CV boot was recent because otherwise there would have been debris and dirt stuck to the grease.

¶ 32    On cross, Fox stated that he believed that he did tell a detective in 1992 that defendant stated that he needed the car quickly because he was headed to California. However, Fox acknowledged that the detective's report of his 1992 interview of Fox did not contain this information.

¶ 33    Brad Janikowski testified that he was 51 years old and living in an Illinois correctional facility. Janikowski had been charged with first degree murder but pled guilty to second degree murder and was sentenced to 16 years' imprisonment. The offense occurred on August 25, 2012, and his expected parole date was July 2020. At some point in 2015 or 2016, Janikowski and defendant were cell mates for a couple of months, and they talked about defendant's case four or five times. Defendant told Janikowski that a police officer had testified that the officer

---

[6]The fact that Fox was told that it was defendant's mother's car links with other evidence introduced later at trial. Later, the State introduced tapes of phone conversations where defendant spoke about his mother's car. *Infra* ¶ 45 n.9.

made a U-turn and then made a left or right turn but that the officer had actually made the opposite turn from what the officer had testified to. Defendant also told Janikowski that defendant was driving down an alley in the dark with his brights on, so that the officer could not have seen defendant. Janikowski's conversations with defendant concerning the officer occurred in late February 2016. On March 14, 2016, Janikowski wrote the Cook County State's Attorney with this information.

¶ 34    Janikowski testified that, prior to writing the state's attorney, he had already received an offer that, if he had pled guilty, the State would reduce his first degree murder charge to second degree murder and recommend a 20-year sentence to be served at 50%. Janikowski identified two substantially similar letters that he mailed on March 14, 2016, with one sent to the state's attorney's office in Skokie and the other sent to the state's attorney's office in Chicago.

¶ 35    In the letters, Janikowski stated that defendant "said the officer stated that he identified [defendant] driving his car down an alley. [Defendant] told [Janikowski] there's no way he could have IDed [defendant] because [defendant] was driving with [his] bright lights on." In addition, defendant "said the officer stated that he made a U-turn after passing him then made a left or a right turn (I forgot which he said). [Defendant]said there was no way the officer made that left or right turn."

¶ 36    On cross, Janikowski testified that he pled guilty in January 2017 to second degree murder and received a 16-year sentence to be served at 50%. Between March 2016 when he sent the letters and January 2017 when he pled guilty, he met several times with assistant state's attorneys. In April 2016, he wrote a second time to the state's attorney's office to say that he would no longer assist them with defendant's case because: "It's causing and giving the jail

too many opportunities to harass me." However, Janikowski testified that no one had, in fact, harassed him at that point, but he just did not like his then current housing at the Cook County Jail. After his first mailing, he was transferred from Cook County to Kankakee County, but he had an issue at Kankakee.[7] While Janikowski was in Kankakee, he met with assistant State's attorneys and was moved to Kendall County. However, at Kendall County, he did not receive his medication, and he began to feel that the state's attorney's office was "retaliating" because, although he explained to them his lack-of-medication[8] problem, they did not do anything to help him. Previously, when he had asked the state's attorney's office to move him, they did. However, after a month, he was moved from Kendall County back to Cook County. After he was back in Cook County, he pled guilty to the reduced charge for a 16-year sentence. After pleading guilty, he was placed at Vandalia Correctional Center, but he asked to be moved from Vandalia Correctional Center because it "is a pretty nasty prison." This time, he did not contact the state's attorney's office. Instead, he "put in a transfer" and was transferred to Graham Correctional Center after three months at Vandalia Correctional Center.

¶ 37    David Collett testified that he was a close friend of defendant and that they had joined the same church in 2012 in Los Angeles. In July 2013, Collett was with defendant at a Sunday afternoon church service when defendant announced that he wanted his church family to listen to a conversation that he was about to have on his cell phone. Defendant then called the victim's mother. Defendant explained to her that he was a witness to the fact that the boy entered someone else's car, and he tried to explain the sequence of events leading up to that moment.

---

[7]Janikowski's transfers are part of the favorable treatment, defendant argues on appeal, that Janikowski received in exchange for testifying in defendant's case. *Infra* ¶¶ 146-47.

[8]Janikowski testified that he had been diagnosed with "major depression and a schizoid personality disorder," for which he was receiving medication.

Collett subsequently listened to the recording and identified the conversation as the one that he had heard.

¶ 38    Collett testified that, after he heard the phone call in church, he "googled" information about the case and learned that the victim's jacket and shoes were missing. At some point, Collett asked defendant about the missing clothing and defendant "came up with a plausible reason" as to why they were missing. Defendant stated that, if the boy had punched the murderer on the nose, then the murderer's blood would have been on the missing clothing. After defendant's arrest in July 2014 in the instant case, Collett maintained contact with defendant because he was helping defendant with his finances. Approximately a month after defendant's arrest, defendant told Collett that he had "gone back to the crime scene on several occasions." On cross, however, Collett admitted that a typewritten statement, signed by Collett in May 2015, stated that defendant told him that defendant had visited the crime scene one time.

¶ 39    Dr. Poni Arunkumar, a forensic pathologist, testified that she was the chief medical examiner at the Cook County Medical Examiner's Office. The trial court qualified Arunkumar, without any objection, as an expert able "to render her opinion as to the cause and manner of death in this case." Another medical examiner had performed the autopsy in this case but had since passed away. Arunkumar performed her own evaluation in this case by first reading the other examiner's report and reviewing photographs.

¶ 40    Arunkumar testified that the victim was wearing black pants with the zipper closed, white socks, white T-shirt, and no shoes. His height was 4 feet, 11 inches, but his weight could not be recorded because the scale was out of order at the time. Tests revealed no cocaine, opiates, alcohol, or chloroform in his blood. The victim's tongue was clenched between his

teeth, so that there were markings of his teeth on his tongue. The clenching could be evidence of a struggle or of a seizure. A black scarf was wound tightly around his neck, and there were dried leaves in the weave of the scarf. Arunkumar opined, within a reasonable degree of medical and scientific certainty, that the cause of death was strangulation. Regarding the force required to strangle the victim, she opined: "To cause compression of the jugular veins, one needs at least four-and-a-half pounds of pressure that is applied continuously for at least two to two and a half minutes for death to occur."

¶ 41    On cross, Arunkumar testified that there was no indication of a punch to the victim's nose. From the photographs and notes, she did not observe any abrasions to the victim's hands or any fractures in his hands or any abrasions to other parts of his body, other than to his neck from the scarf. The victim had no fractures or broken bones.

¶ 42    Kenneth Vercammen Jr. testified that, in October 2004, he worked full-time in Los Angeles as a private investigator for Archangel Investigations and Protection (Archangel), where he had worked for eight years. Vercammen was also a part-time actor, and he noticed a Craigslist ad for a chase scene in a student film. Vercammen applied by e-mailing a head shot and a resume. After receiving a response, Vercammen met with defendant at a cafe. Defendant called himself "Chivas Via" and said he was a film student. Vercammen explained that actors often agree to work without pay on short films by students for the experience, and Vercammen agreed to do that for defendant. They exchanged phone numbers and, over the course of a few nights, completed the shooting of a chase scene on the streets near the cafe. After the shooting was complete, defendant kept calling Vercammen, and defendant joined Vercammen and his girlfriend for Thanksgiving dinner in 2004.

¶ 43 Vercammen testified that he had a phone call with defendant concerning the murder in this case that prompted Vercammen to go to Radio Shack and buy equipment to prepare his phone to record conversations with defendant. On November 30, 2004, Vercammen recorded two conversations with defendant and then discussed the issue with Michael Meek, who also worked at Archangel. Meek contacted the State's Attorney's Office in Chicago and, on December 13, 2004, investigators from the Cook County State's Attorney's Office and the Cook County Sheriff's Police Department contacted Vercammen. Vercammen met with the FBI and agreed to wear a recording device to record conversations with defendant.

¶ 44 Vercammen identified three cassette tapes as tapes that he had purchased from Radio Shack and had used to record conversations with defendant, as well as a transcript of the conversations. Defendant objected to their admission, which the trial court overruled. The State also handed defense counsel and the court " a transcript of the clips that we're about to play." Both the full transcript and the transcripts of the clips are in the appellate record. Vercammen testified that, prior to recording these conversations, he did not know any details about the case.

¶ 45 In the first clip, defendant stated that, in 1990, he was driving his mother's car, which was a white Ford Thunderbird.[9] While defendant was driving in Skokie, a "kid" waved at defendant so he stopped to pick the kid up, but the kid hopped into another white car. This occurred "just before sunset." At first, defendant thought it was about seven o'clock, but he had just moved from California where it became darker at a later hour. Now defendant remembers that it was actually 4 p.m. or 5:30 p.m. The other car looked similar to the car defendant was driving but it was a Cadillac. As the Cadillac pulled next to defendant's car, the

_____

[9]This clip contradicts testimony by Fox, the mechanic, who testified that he worked on a 1983 Chrysler New Yorker, not a Ford Thunderbird. Fox also testified that he was told the Chrysler was defendant's mother's car. *Supra* ¶ 31.

17

boy turned to defendant with "a big smile," and defendant noted that the driver was a "[b]ig fat guy with a big belly," sideburns, and a big cigar. The Cadillac turned into the park, and defendant drove past the park. Later that same evening, defendant was entering a 7-Eleven store when he noticed "the same kid" exiting it, which was "about twelve thirty—one o'clock in the evening." Defendant also noticed a red Dodge "Hemi" that was "racin' up and down the street." When defendant exited the 7-Eleven and headed toward his car, defendant noticed "this kid" walking across the street and "this Red Hemi came by again." After the kid turned the corner and was out of view, defendant heard the Hemi come to a stop and then "peel his wheels" and "take off." Defendant was curious, so he went over to see where the kid had gone but did not see him. Defendant did not know if the kid went into a house or into the Hemi. The next morning, the boy's photo appeared in the newspaper and defendant read that the boy had been strangled in the same park that defendant had seen the Cadillac turning into. However, defendant said that the boy could not have been killed when defendant observed the Cadillac turning into the park since defendant had observed him later in the evening.

¶ 46    In the second clip, Vercammen asked defendant how defendant knew that he had not been "cleared" of the murder. Defendant replied that he was a prime suspect 13 years ago and he was sure it had not changed. When Vercammen asked what the evidence was, defendant replied that it was "all circumstantial stuff."

¶ 47    In the third clip, Vercammen asked if the victim was sexually abused, and defendant said that he was not. Defendant speculated that the victim would not have gone into the woods unless he was with someone he knew, particularly since the police said there were no signs of a struggle. When Vercammen asked why defendant was "openin' up" to Vercammen, defendant replied that it was because Vercammen was "in that line of work." Defendant was

wondering how to find information about the investigation. Vercammen said that, if defendant wanted to find out if the case was still open, defendant could call the detective who defendant had spoken with. Defendant replied: "Yeah, I don't think it's such a good idea to do that," because they would wonder "why am I calling after all these years." Defendant said that "it's like uh—a hang nail *** you get a hang nail on your finger and you—you just want to pull that nail off *** and you just never do." Defendant added: "it's not a hang nail that I'm guilty or anything 'cause I'm not."

¶ 48    In the fourth clip, defendant said that the police may have found the boy's killer. Defendant said he would pay Vercammen to call the Skokie Police Department and say that Vercammen was investigating and wanted some information about defendant. Vercammen replied that they would ask Vercammen questions and "put two and two together." Defendant decided to "let sleeping dogs lie."

¶ 49    In the fifth clip, defendant repeated that the other driver had a big belly and smoked a fat cigar. Defendant added that the other driver looked "Hispanic" or Italian and was "dark skinned." Defendant said that he went to the park "about a year after the incident."

¶ 50    In the sixth clip, defendant stated that he had to be careful because: "I could meet some little—some teen—sixteen year old boy and start talkin' to 'em and innocently and he might just get—you know, like gee why is this guy talkin' to me? I (inaudible) tell my mother or something like that you know and then I'll be in a world of f***in' trouble again, right?"

¶ 51    In the seventh clip, defendant stated that "it's very offensive to me now when I—if I think about you know engaging in any sort of act with somebody who's under eighteen years old." Now, defendant wants somebody to be over 20 because, otherwise, defendant can meet someone who says he is 18 but he is really 16 and "[t]hen I'm in trouble again."

19

¶ 52    In the eighth clip, Vercammen began a sentence stating, "when you first saw him," and "you saw him later," which Vercammen clarified in his trial testimony that the "him" in that sentence was the victim. In the clip, defendant interrupted Vercammen and said: "The only time I ever saw him, I saw him I saw him—I was driving by the forest—the woods, okay[,] and he was outside thumbin' a ride." When the boy waved, defendant thought the boy was waving at defendant, but when the boy hopped into "another white car behind" defendant, defendant thought, "mistaken identity." Defendant thought he "was the person who's supposed to pick him up and actually it was the car behind" defendant. Defendant repeated that he went to the park a year later.

¶ 53    In the ninth clip, defendant said that he thought he saw the boy again at the 7-Eleven— "at least it kind of looked like him." Defendant said but "maybe that was—maybe that was New Year's Eve night or maybe it was the night before. I don't know."

¶ 54    In the tenth clip, defendant said that he "guess[ed]" that the victim "probably lived around the Seven-Eleven," but he did not know.

¶ 55    In the eleventh clip, Vercammen suggested that the killer was angry. In response, defendant said: "this is my scenario any how that—that the young boy had a uh—a male lover and *** they went to that park and there his male lover grabbed his watchamacal—and strangled him and uhn—just left him." Defendant thought that the victim was "probably gay" because, when defendant's car pulled up alongside the other car, the victim gave defendant "one of them big warm smiles that you know guys give other guys." Defendant said that the driver of the other car looked like "he had the money," and defendant speculated that "maybe the guy would give [the victim] money for doin' him favors." Vercammen suggested that maybe the boy wanted to break up with the man. Defendant agreed that would make sense and

that maybe the boy said he did not need the man's money and maybe insulted him, and the man "got pissed off and killed him."

¶ 56        Vercammen testified that, after December 13, 2004, he cut off communication with defendant. On cross, Vercammen stated that, almost 10 years later, in July 2014, a state's attorney and a detective visited him in Los Angeles and wrote out a handwritten statement that Vercammen signed. The parties stipulated that "nowhere in this [statement] does it say that [defendant] said that he killed [the victim]."

¶ 57        Mark Erickson testified that, in 1992, he was the detective with the Morton Grove police who worked on this case. On January 6, 1992, Erickson contacted someone known by the name "Rico Rocco." Erickson was informed that this individual had contacted Investigator Troka of the Cook County Sheriff's Police Department one or two nights earlier saying that he had information about the case. Erickson called the phone number that he had received from Troka and left a message. A person identifying himself as "Robert" called back, saying that "he was a maintenance person and that he was writing an article for a local newspaper about the case."[10] "Robert" stated that he had observed a teenage boy, in a fatigue jacket at Dempster Street and Lehigh Avenue in Morton Grove, enter an older white Cadillac driven by an older white male who was smoking a cigar. The Cadillac drove east on Dempster Street to Harrer Park and then turned northbound into the park.

¶ 58        Erickson testified that Harrer Park was next to Linne Woods, where the victim's body was found. "Robert" stated that he saw this boy a few more times: once with three other teenage boys in downtown Skokie at around 7 p.m.; a second time around 9 p.m. at Oakton and Lincoln Avenues when the boy waved or smiled at him; and again, walking alone on Gross Point Road,

---

[10]This was, in fact, not correct. Defendant was not writing an article for a local newspaper.

just south of Lincoln Avenue, where the 7-Eleven is, at 11:30 p.m. The third time, Robert thought that the boy was looking at his vehicle, so he circled the block to go back and talk to or see him but, when he returned, the boy was gone. After refreshing his recollection with his report, Erickson stated, for the record, the phone number that he had called (which was the same number that appeared on the "Rico Rocco" card and stamp).

¶ 59    On cross, Erickson testified that Linne Woods is west of Harrer Park, and it extends behind Harrer Park. Where it extends behind Harrer Park, it is both north and east of Harrer Park. Linne Woods forms an upside down L around Harrer Park. The victim's body was discovered in Linne Woods, slightly east and north of Harrer Park.

¶ 60    Andra Williams testified that he was in jail, pending trial, and was charged in one case with predatory criminal sexual assault and in another case with aggravated criminal sexual abuse. From January 2016 to January 2017, Williams's cell mate was defendant, who went by the name "Rocky." During the year, they discussed defendant's case three times. Defendant stated that he met a young boy named "David" at a 7-Eleven store, who defendant was trying to "code" or date. Defendant bought the boy candy and soda. After they met, they talked on the phone a couple of times. Defendant knew the victim for two weeks, prior to the offense. On the day of the offense, defendant met the victim at a 7-Eleven. The victim needed a ride, and they ended up driving to the forest preserve. Defendant was driving a white Taurus. After parking at the forest preserve, they walked through the forest preserve and defendant was "trying to get a blow job from the kid." But the victim refused and said he would tell someone about this. Defendant and the victim "got into fisticuffs about it" and "wrestled." Defendant grabbed the scarf around the victim's neck and "started to choke him out." During this time,

the victim was "looking up and gasping for air." Defendant continued to strangle the victim with the victim's scarf, until defendant realized that the victim had stopped breathing.

¶ 61    Williams testified that defendant said that, after he realized that the victim was no longer breathing, defendant returned to his vehicle and drove off, out of the forest preserve and through an alley. Defendant said that an old man had spotted defendant, and defendant was questioning how the man could have spotted him, when defendant was "a mile away." Defendant drove home. Later, when defendant appeared in court, he would see the victim's mother and "he would feel ashamed and embarrassed and feel hurt about what he did to his— her son; that he wanted forgiveness for it."

¶ 62    Williams testified that Williams's attorney set up a meeting for Williams with law enforcement personnel and with Williams's attorney present. At that meeting, Williams related what defendant said.

¶ 63    On cross, Williams testified that he was facing up to 60 years for predatory criminal sexual assault and that this case occurred when he was out on bond for aggravated criminal sexual abuse. If convicted of both offenses, he would have to serve consecutive sentences. Williams denied telling the police in February 2017 that defendant told him that, on the night that the victim was murdered, the victim was dropped off by a white vehicle at the 7-Eleven. Williams testified that defendant stated that, when defendant was choking the victim, the victim looked up and asked "why are you doing this[?]"[11]

¶ 64    John Duffy testified that, in June 1998, he was a detective with the Chicago Police Department, but "detailed" to the Cook County State's Attorney's Office to work on "old cold case murders." On June 9, 1998, he flew to Las Vegas with other law enforcement personnel

---

[11]This statement by the victim is used by defendant in an argument on appeal. *Infra* ¶ 144.

to meet with defendant. After being read his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), defendant stated that he was then presently living out of his van in Las Vegas and working at a Pizza Hut. Defendant recalled giving a recorded interview to Chuck Goudie, and he recalled the day of the murder in January 1992. Defendant stated that, on the day of the murder, he was driving a white 1983 Chrysler New Yorker eastbound on either Oakton Avenue or Dempster Street, when he noticed a boy on the side of the road. Defendant noticed the boy because the boy appeared "either in distress or in trouble or he was waiting for somebody and flagging down somebody." Defendant slowed down and observed the boy enter a white Cadillac that was behind defendant's car. Defendant obtained a partial license number for the Cadillac, which was "VC." Both cars proceeded eastbound, but defendant was stopped by a red light while the Cadillac continued on and made a left turn into the forest preserve. The driver of the Cadillac was a white male, about 45 to 49 years old, 5 feet, 9 inches, tall, heavyset, 230 pounds, with long sideburns, and smoking a cigar. The boy was a white male, between 15 and 17 years old, 5 feet, 7 inches, tall, with light-colored hair, wearing blue jeans, gym shoes, a jacket, and a scarf.

¶ 65      Duffy testified that, initially, defendant said that the last time he saw the boy was when the boy entered the Cadillac. However, during further conversation, defendant indicated that he saw the boy again later in the evening near a bowling alley on Oakton Avenue. After seeing the boy near the bowling alley, defendant drove to a sushi bar in Chicago. Eventually, defendant drove home to Park Ridge, arriving there between 1 a.m. and 3 a.m. On the way home, he stopped at either a White Hen Pantry or a 7-Eleven store. Defendant stated that he later viewed a photo in the newspaper and thought it was a photo of the same boy who had entered the Cadillac. Then defendant drove to the area where he had seen the Cadillac driving

into and realized that it was the same area where the boy's body had been found. Then defendant contacted the police, talked to them, and provided his pager number.

¶ 66    Duffy testified that, on June 9, 1998, Duffy asked defendant about the damage to the CV boot of defendant's vehicle, but defendant would not discuss it. Duffy asked defendant what defendant thought had happened to the victim and defendant said "that the boy was stopped on his way home and the person *** asked him where he lived[,] and the boy got into the car. Once the boy got into the car, the person drove to the forest preserve where the boy and the man smoked some marijuana. After smoking marijuana, the man made a proposal to the boy, which the boy refused, and then[,] he said[,] things then got out of hand."

¶ 67    On cross, Duffy testified that defendant did not sign a statement. An assistant state's attorney came into the room, and introduced himself, but defendant did not want to talk to him. Duffy also said that hair samples were taken but not DNA samples.[12]

¶ 68    Sergeant Larry Rafferty testified that, in late 2007, he was an investigative sergeant with the Cook County Sheriff's Police and the Cold Case Unit was under his supervision. In February 2010, as part of the investigation, he met with Kara Stefanson, who was the DNA resource specialist for the Cook County State's Attorney's Office. After the meeting, he submitted to the Illinois State Forensic Lab some of the items of evidence collected in connection with the victim's autopsy, including the victim's clothing, hair samples, a blood standard from the victim, and oral and rectal swabs. In January 2013, the victim's mother contacted him, and then he obtained a court order to record future conversations between her and defendant. In July 2014, he traveled with other law enforcement personnel to arrest and

---

[12]The defense later introduced a stipulation between the parties stating that a DNA profile for defendant was obtained from a hair sample. *Infra* ¶ 76.

interview defendant. After they knocked, defendant opened the door and they identified themselves: at that point, defendant said that he knew why they were there.

¶ 69        After the end of testimony, the State read several stipulations into the record. First, the parties stipulated that, if Vic Pearson were called to testify, he would testify that, on January 2, 1992, he was a Morton Grove police officer patrolling the area near Austin Avenue and Davis Street in Morton Grove. As Pearson was traveling westbound on Davis Street, he observed a white Chrysler exiting the alley between Austin and McVickers Avenues between 4:30 a.m. and 5:30 a.m. It was further stipulated that this information was first documented by Detective Elwin Trammel in a report dated March 22, 1998.

¶ 70        The parties stipulated that, if Goudie were called to testify, he would testify that, in 1998, he was a news reporter for Channel 7 News; that he was following the investigation into the victim's 1992 death; that he interviewed defendant; that the interview was recorded; and that it aired in March 1998. The stipulation identified a government exhibit as a true and accurate recording of the interview. The State then asked for the exhibit to "be entered into evidence" and asked to "be allowed to publish a portion of that interview, an audio portion." The trial court responded, "Please," and a portion was played. The appellate record does not indicate what portion was played.

¶ 71        At the end of the case, the State moved all its exhibits into evidence, and the trial court admitted all of them, except for a demonstrative sketch of the area and a police report used to refresh a witness's recollections. The State rested, and the defense moved for a directed finding, without argument, which the trial court denied.

¶ 72        The defense then read two stipulations. The parties stipulated that, if called to testify, Detective Robert O'Neil, of the Cook County Forest Preserve Police, would testify that he

interviewed Murphy twice in January 1992 and that, at no time, did Murphy mention an individual in a white vehicle calling out to him in Skokie within two weeks of the murder. Murphy mentioned this, for the first time to law enforcement personnel, in October 2013.

¶ 73 The parties stipulated that, if called to testify, Robert Thomas, a special agent with the Illinois State Police, would testify that he interviewed Mihelic on January 9, 1992, and Mihelic told him he saw the victim walking northbound on Harms Road at approximately 10:10 p.m. but never told him that he saw the victim walking down the middle of the street.

¶ 74 The parties stipulated that, if called to testify, Detective Trammel would testify that he interviewed Fox on April 7, 1992, and Fox did not tell him that defendant said either that he ran over a curb or that he was anxious to be on his way to California. If called to testify, a Cook County state's attorney investigator would testify that Fox was interviewed again in 2014 and, similarly, did not make those statements.

¶ 75 The parties stipulated that, if called to testify, Sergeant Rafferty, of the Cook County Sheriff's Police Department, would testify that he interviewed Williams and that Williams stated that, on the night of the murder, the victim was dropped off by a white vehicle at the 7-Eleven store.

¶ 76 The parties stipulated that, if called to testify, Meredith Misker would testify that, in 2008, she was a forensic DNA scientist with the Illinois State Police; that, in December 2008, she notified Sergeant Rafferty that a DNA profile had been obtained for defendant from a hair sample; that, in October 2012, Sergeant Rafferty was notified that "[e]xtracted DNA product" was "recovered from stains on a T-shirt, underwear, jeans, and scarf" in this case; and that "[n]o human DNA profile was identified in the extracted DNA."

¶ 77    The trial court received the stipulations into evidence, the defense rested, and the parties proceeded to closing argument. The State argued that defendant knew that he had been observed by a Morton Grove police officer as he exited the alley shortly after the murder and, therefore, defendant began contacting the authorities, trying to throw them off his trail, by describing a different white car that the victim had allegedly entered. When the officers went to defendant's residence to talk to him, he had fled, thereby establishing flight. The mechanic testified that defendant had been in a hurry to head to California. The State asserted that defendant was a sexual predator who waited until all the other boys had gone home and the victim was the last one left alone. The State maintained that T.C.'s testimony established motive by establishing that defendant was a sexual predator of young boys. The State theorized that, when defendant spoke to Vercammen and others, he was not imagining what happened, but rather he was reliving it, including the "big warm smile[ ]" that he told Vercammen that he believed the victim had given him. The State argued that the murder was eating away at him like a "hangnail," as he told Vercammen. In addition to the evidence that established flight, motive, and opportunity, the State contended that defendant's confessions to his jail mates left no doubt that defendant was the murderer.

¶ 78    In response, the defense argued that, other than the place and cause of death, we knew nothing about what happened to the victim. The defense contended that, although defendant thought he had seen the victim that night, it was not the victim that defendant had seen. It was not the victim because defendant had observed a boy in a fatigue jacket and had observed him at an earlier time, when the victim was still having dinner at home. The State proved that defendant was providing information that he thought could be helpful, to anyone who would listen. None of the boys who were with the victim mentioned a white car when they were first

28

interviewed. It was not until defendant called about a white car that a white car was mentioned by them. The defense argued that the police most likely planted the idea of a white car by asking the boys if they had seen one. The defense argued that the last time anyone saw the victim alive, he was walking down the street, from the 7-Eleven, toward his home, which was close by, and that no one knew what happened after that. The defense contended that T.C.'s testimony failed to show *modus operandi* because there was no consistency between T.C. and the victim. No card, such as the one given to T.C., was found on the victim; T.C. was approached in the middle of the day, whereas the victim disappeared at night. There was no evidence of any phone calls between defendant and the victim, as there was with T.C. The defense argued that the State proved defendant "distasteful" but did not prove him guilty of this murder. If one believed Williams's recitation of a confession, then one would have to believe there was a struggle, and there was no evidence of a struggle, particularly in light of the victim's brown belt in karate. If Morton Grove police officer Pearson had observed defendant in the alley, then he observed defendant seven hours after the victim disappeared, with no explanation of what happened during the ensuing seven hours.

¶ 79        In rebuttal, the State argued that, in various statements, defendant claimed that he saw the victim three times on the night of the murder, that these multiple views could not have been a coincidence, and that it must mean that defendant was watching the victim and waiting for the moment that he was alone. The State argued that defendant was not on his way home from a sushi restaurant in Chicago because "there is no place in Chicago that would take you past this 7-Eleven, if you lived west of [the] Edens Expressway on Touhy Avenue in Park Ridge," as defendant did.

¶ 80    After taking a half-hour break to review the evidence and her notes, the trial court found defendant guilty. Defendant filed a posttrial motion for a new trial, which the trial court denied. When denying the posttrial motion, the court observed that "[t]his was a bench trial" and that "circumstantial evidence can be used to convict someone beyond a reasonable doubt." The court explained that "the way these cases sometimes go is that there are building blocks and evidence sort of keeps getting built up until they've reached the point in which a judge could make a determination that it was beyond a reasonable doubt," and that it made this determination in this case. After considering factors in aggravation and mitigation, the trial court sentenced defendant to 45 years with the Illinois Department of Corrections. Since defendant elected to be sentenced under the law as it existed in 1992, he was eligible for day-for-day good-time credit. On December 10, 2019, the court denied defendant's motion to reconsider the sentence, noting defendant's eligibility for good-time credit. Defendant filed a timely notice of appeal on December 10, 2019, and this appeal followed.

¶ 81                                    ANALYSIS

¶ 82                            I. Evidence of Bad Acts

¶ 83    First, defendant argues that the trial court erred by admitting (1) T.C.'s testimony about phone conversations with defendant and (2) the "Boy profile for exploitation" list found in defendant's storage area. Defendant argues that the trial court erred by admitting both as propensity evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)). Section 115-7.3 permits the admission of evidence of a defendant's commission of certain sex offenses when a defendant is accused of a first degree murder that "involves sexual penetration or sexual conduct." 725 ILCS 5/115-7.3(a)(2) (West 2018). Defendant argues (1) that neither T.C.'s testimony or the list established a prior

offense; (2) that the State failed to prove that the victim was sexually penetrated or contacted as required by the statute; and (3) that the evidence was not admissible on any other grounds, given its dissimilarity to the charged offense.

¶ 84   In response, the State argues that, although the State initially sought to introduce the evidence pursuant to section 115-7.3, it withdrew its request to admit the evidence on propensity grounds. The State argues that the evidence was properly admitted, instead, pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), in order to show (1) motive, (2) identity, (3) *modus operandi*, (4) a continuing narrative of events, and (5) to rebut a defense.

¶ 85   In his reply brief, defendant states that he "accepts the State's concession that the other-acts evidence of T.C.'s testimony and the profile list *** were ultimately only offered and admitted to rebut a defense, to show a continuing narrative of events, and to prove motive, *modus operandi*, and identity." This court similarly accepts the State's concession, and the State has, thereby, forfeited other arguments by failing to argue them on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *People v. Chatman*, 2016 IL App (1st) 152395, ¶ 45 n.19 ("This court has repeatedly held that a party forfeits a point by failing to argue it.").

¶ 86   Pursuant to Rule 404(b), evidence of other crimes or bad acts is admissible "to prove intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003); Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (evidence of other crimes or bad acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

mistake or accident"). Even when evidence of other crimes or bad acts falls into one of these categories, it may still be excluded "if the prejudicial effect of the evidence substantially outweighs its probative value." *Donoho*, 204 Ill. 2d at 170; Ill. R. Evid. 403 (eff. Jan. 1, 2011) ("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

¶ 87    Evidentiary rulings by the trial court, such as the one we are asked to review, are generally within the sound discretion of the trial court and are generally not reversed by an appellate court unless the trial court abused its discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). "The decision whether to admit evidence cannot be made in isolation," and the "trial court must consider a number of circumstances that bear on the issue, including questions of reliability and prejudice." *Caffey*, 205 Ill. 2d at 89. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89. Our supreme court has repeatedly admonished its appellate courts that reasonable minds may differ about whether evidence of other crimes or bad acts is admissible without requiring reversal under an abuse-of-discretion standard of review. *Donoho*, 204 Ill. 2d at 186 (citing *People v. Illgen*, 145 Ill. 2d 353, 375-76 (1991)).

¶ 88    As we explain below, the challenged evidence related to motive and identity and, thus, we cannot find that the trial court's decision to admit was arbitrary or fanciful.

¶ 89    The State's theory of the case was that the murder was sexually motivated. This theory was supported by direct testimony from a cell mate that defendant stated that the murder was sexually motivated and by circumstantial evidence that defendant repeatedly told others that he believed the murder was sexually motivated, albeit by someone else. *People v. Cerda*, 2021

IL App (1st) 171433, ¶ 109 ("While the State is not required to prove motive, it is entitled to do so when evidence of motive exists.").

¶ 90       Defendant's cell mate, Williams, testified that defendant knew the victim for two weeks prior to the murder, during which time defendant was trying to "code" the victim by buying the victim candy and soda. On the night of the offense, Williams testified that defendant was "trying to get a blow job from the kid," but the victim refused and threatened to tell someone. Williams testified that defendant related that defendant grabbed the scarf around the victim's neck and choked the victim to death. Williams's testimony about the sexual motivation for the murder was bolstered by repeated statements by defendant that he believed that the murder was sexually motivated.

¶ 91       Vercammen testified that he had a phone conversation with defendant in which defendant stated that he thought the victim was "gay" because the victim gave defendant "one of them big warm smiles that you know guys give other guys." Defendant speculated to Vercammen that the murderer gave the victim money for "favors" but that the victim wanted to break up with him and insulted the murderer, and then the murderer became angry and killed the victim. Defendant's statement to Vercammen about money for "favors" was similar in motive to Williams's testimony that defendant had been buying the victim candy and soda for two weeks with the goal of sexual favors in return.

¶ 92       The testimony by both Williams and Vercammen that the murder was sexually motivated was further supported by the testimony of Duffy. When Duffy asked defendant what he thought happened to the victim, defendant stated that the victim and the murderer drove to the forest preserve, that the murderer propositioned the victim, and that the victim refused and then things "got out of hand."

¶ 93        In light of the testimony by Williams, Vercammen, and Duffy that supported the State's theory that the murder was motivated by an adult male's desire for sexual favors from a teenage boy who refused him, we cannot find that the trial court's decision to admit T.C.'s testimony and the profile list was arbitrary or fanciful. T.C.'s testimony and the profile list from defendant's storage area established defendant's desire for sexual favors from teenage boys, thereby supporting the State's theory about motive—which was consistently and constantly repeated by defendant to whoever would listen.

¶ 94        In addition, T.C.'s testimony was properly admitted as identity evidence. Even when the other bad acts are not sufficiently distinctive to qualify as *modus operandi* or signature evidence, the evidence may be admissible to rebut a defendant's claim of mistaken identity concerning an object. "Where evidence of prior bad acts is offered to prove *modus operandi* ***, there must be a high degree of identity between the facts of the crime charged and the other offense in which the defendant was involved." *Illgen*, 145 Ill. 2d at 372-73. "The two offenses must share such distinctive common features as to earmark both acts as the handiwork" or signature of the same person. *Illgen*, 145 Ill. 2d at 373; see also *People v. Quintero*, 394 Ill. App. 3d 716, 726 (2009) ("The crimes must have distinctive features that are not common to most offenses of that type."). However, the same degree of distinction is not required when the evidence is used to rebut defendant's claims of mistaken identity regarding an object. *Quintero*, 394 Ill. App. 3d at 726 ("general areas of similarity are sufficient"). When used to show identity, the evidence "links the defendant to the offense at issue through some evidence, typically an object," from the other offense or bad act. *Quintero*, 394 Ill. App. 3d at 727; see also *People v. Clark*, 2015 IL App (1st) 131678, ¶ 50.

¶ 95      The object in the case at bar was the white car. Pearson observed a white Chrysler exiting an alley near the scene of the murder, shortly before the body was discovered. The testimony of cell mate Janikowski established that defendant was troubled by the fact that the officer had observed defendant's car driving down the alley. However, Janikowski's testimony also established that defendant believed that the officer could not identify defendant as the driver because defendant was driving with his bright lights on.

¶ 96      Defendant then told numerous people that the victim had entered a white boxy-style car but, never of course, his own white boxy-style car. First, the victim's mother testified that defendant told her in 2013 that, on the night of the murder, he observed a boy enter a white Cadillac with a partial license plate number of "VC." Second, Vercammen testified that defendant told him that, while driving a white Ford Thunderbird, defendant observed the victim enter a similar looking car, but the other car was a Cadillac. Defendant told Vercammen that, when the boy waved, defendant thought the boy was waving at defendant, but when the boy hopped into "another white car behind" defendant, defendant thought, "mistaken identity." Third, Erickson testified that, in 1992, defendant stated that he had observed a teenage boy enter an older white Cadillac, driven by an older white male. Fourth, defendant told cell mate Williams that he was driving a white Ford Taurus on the night of the murder. Fifth, defendant told Duffy in June 1998 that, on the night of the murder, he was driving a white 1983 Chrysler New Yorker when he observed a boy flagging down and entering a white Cadillac with a partial license plate number of "VC." This evidence establishes that defendant was repeatedly trying to establish a case of mistaken identity concerning the white car that the victim had, in fact, entered.

¶ 97        The facts concerning the victim and T.C. were similar enough to rebut defendant's repeated claims about which white car the young male victim had entered. The victim was 15 years old; T.C. was 16 years old when defendant first approached. The victim was walking home alone when he was last seen; T.C. was walking home alone when defendant approached. As already noted, defendant repeatedly claimed to various witnesses that, on the night of the offense, the victim entered a white car similar to his own but, of course, not his. However, T.C. testified that defendant was driving a white boxy car when defendant approached him. Defendant talked to T.C. about strangulation and asphyxiation and about going to the forest preserve to have sex; comparatively, the victim was strangled to death in the forest preserve. Given the similarities, we cannot find that it was an abuse of discretion to admit T.C.'s testimony to rebut defendant's repeated claims of mistaken identity concerning the white car that picked up the victim.

¶ 98        Defendant argues that the State failed to establish that the profile list was written by defendant. Whether or not defendant wrote the list, the police found it saved in his storage area, with other significant papers and documents belonging to defendant, such as receipts, a passport photo, and a vehicle identification card.

¶ 99        Defendant argues that, even if the list and T.C.'s testimony were relevant for one of the named purposes, the danger of unfair prejudice substantially outweighed the probative value. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ***." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Although the rules of admissibility of evidence are the same whether a trial occurs with or without a jury, when the trial court is the trier of fact, a reviewing court will presume that the trial court considered only admissible evidence and that the trial court considered the evidence

only for the purpose for which it was admitted. *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). However, this presumption, that the court in a bench trial considered only competent evidence in reaching its finding, "may be rebutted where the record affirmatively shows the contrary." (Internal quotation marks omitted.) *Naylor*, 229 Ill. 2d at 603-04. In the case at bar, the record does not disclose remarks or actions by the trial court that would indicate that it considered the evidence in an unfairly prejudicial manner. Accordingly, we do not find that the trial court's ruling was arbitrary, fanciful, or unreasonable or that no reasonable person would take the view adopted by the trial court.

¶ 100    For the foregoing reasons, we are not persuaded by defendant's claim that admission of T.C.'s testimony and the profile list were an abuse of discretion.

¶ 101                    II. Comment by Victim's Mother

¶ 102    Second, defendant argues that the trial court erred by admitting a comment by the victim's mother that she believed that defendant killed her son. During a taped phone call with defendant, the victim's mother stated: "I—just have a gut feeling that—I just wish I knew why you did it. I think you did it and I wanna know why. I don't wanna die in my grave and not know what happened to my son." Defendant argues that this comment was unfairly prejudicial, irrelevant to any issue at trial, and a violation of the personal knowledge rule. The personal knowledge rule provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Ill. R. Evid. 602 (eff. Jan. 1, 2011).

¶ 103    As noted above, evidentiary rulings are generally reviewed only for an abuse of discretion, and "[a]n abuse of discretion will be found only where the trial court's ruling is

arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89.

¶ 104   In response to defendant's claim, the State asserts that the mother's comment was admitted, not for the truth of the matter asserted within it, but to show the long pause before defendant responded to it with a denial. Defendant argues that the State compounded the comment's prejudicial effect by "harping" on the comment during the State's closing rebuttal argument. During the State's rebuttal closing argument, the prosecutor made the following argument regarding this comment and the ensuing pause by defendant:

> "[H]alf way through the defendant's rambling conversation, [the victim's mother] cuts right to the chase in the way only a mother can, quote, I just have a gut feeling that I just wish I knew why you did it. I think you did it and I want to know why. I don't want to die in my grave and not know what happened to my son. The defendant doesn't answer.

> This is beyond a pregnant pause. One thousand. Two one thousand. Three one thousand. Four one thousand. I didn't kill your son. I didn't do it. I didn't know your son. I never talked to him. I never met him. I don't know—I know I—

> I don't know if you are in communication with the police or not, you know. I don't know if they—what they tell you they find or anything. I don't know that.

> He gets accused of murder by the victim's mother, and within a few seconds, he's trying to get information on the investigation asking whether she knows anything about what the police are doing. Just unbelievable. That silence after she accuses him of murder is deafening, and it speaks volumes."

¶ 105     The aforementioned statements constituted legitimate argument based on the admitted evidence, including the tape recording. The trial court listened to the tape and was able to decide for itself whether there was a pause, whether the pause was long, and whether it had any significance. The State did not argue that the mother had any particular knowledge concerning the identity of the murderer, other than what the trial court had already heard in court. Without the admission of the mother's comment, the defendant's reaction would have been unintelligible. Whether the State's argument had any persuasive weight was for the trial judge, as fact finder, to decide.

¶ 106     To the extent that any unfair prejudice could be claimed from the mother's comment that she did not want to die without knowing what happened to her son, the trial court understood that this was a staged comment. The trial court understood that the mother had agreed to record her conversation for the benefit of the police and that the mother was most likely making the type of comment that she hoped would elicit information and a reaction from defendant.

¶ 107     As we noted above, when the trial court is the trier of fact, a reviewing court will presume that the trial court considered the evidence only for the purpose for which it was admitted. *Naylor*, 229 Ill. 2d at 603. For these reasons, we find the trial court's decision was reasonable given the circumstances and cannot find an abuse of discretion in admitting the mother's comment.

¶ 108     After this appeal was fully briefed, this court granted defendant's motion to cite additional authority that had been published while this case was under consideration.[13]

---

[13]We denied the State's motion to file a response to the motion, which, pursuant to Illinois Supreme Court Rule 361(b)(3) (eff. July 1, 2017), was due on March 9, 2022. Defendant filed his

Defendant cited *People v. Allen*, 2022 IL App (1st) 190158. In *Allen*, the appellate court reversed and remanded for a new trial, on the ground that the trial court's failure to respond to a jury note constituted reversible error. *Allen*, 2022 IL App (1st) 190158, ¶ 59. In *dicta*, the appellate court chose to address additional issues that might occur on retrial. *Allen*, 2022 IL App (1st) 190158, ¶ 66. These additional issues included the trial court's admission of a taped phone call under the tacit admission rule. *Allen*, 2022 IL App (1st) 190158, ¶ 70. In the instant appeal, defendant argues in his post-briefing motion that, pursuant to *Allen*, admission of the mother's statement and defendant's pause violated the tacit admission rule.

¶ 109    Upon review of the tacit admission argument, we notice that while there was discussion about defendant's silence as a result of consciousness of guilt, defendant did not put forth a comprehensive argument regarding the alleged violation of the tacit admission rule until he filed the supplemental authority. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides that "[p]oints not argued" in an appellant's initial brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." In his initial appellate brief, defendant argued that the mother's statement was inadmissible for only three reasons: (1) it was unfairly prejudicial, (2) it was irrelevant, and (3) it violated the personal knowledge rule. Defendant may not fail to address an issue and then raise it after the fact in a post-briefing motion.

¶ 110    The State made this argument, repeatedly, in the court below: it is not new. Prior to trial, defendant moved to suppress this particular statement by the mother on the ground that it was "unfairly prejudicial." In its written response, the State argued that this statement was

motion for leave to file supplemental or additional authority on March 4, 2022; this court granted the motion on March 10, 2022; and the State did not file its motion until March 25, 2022.

probative because, after it, "there was a long and noticeable pause before defendant denied his involvement." At a pretrial hearing on January 6, 2017, the trial court heard extensive argument about this particular statement. Defendant again argued unfair prejudice, and the State again argued that the pause was "essentially an admission by omission" and "consciousness of guilt." The trial court reserved judgment, stating that it would rule next time on whether "the probative value is not outweighed by prejudice." On February 10, 2017, the trial court permitted the parties to reargue the admissibility of this particular statement. Both sides grounded their arguments on Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), the rule concerning unfair prejudice, and the State again argued about "the significant pause." After again listening to extensive argument about this particular statement, the trial court ruled that "the probative value outweighs any prejudice." At trial, the State argued in its rebuttal closing that the pause showed consciousness of guilt by defendant, despite defendant's immediately ensuing denials. *Supra* ¶ 104. In his posttrial motion for a new trial, defendant noted that the State had "argued that a pause in the conversation" was "somehow an admission by omission." Defendant's posttrial motion argued that the admission of this particular statement was unfairly prejudicial and that the State's argument about the pause was "pure conjecture."

¶ 111 Despite the State's constant arguments about the pause, defendant chose not to raise the tacit admission rule in response—not at any time in the court below, not in his initial appellate brief, and not in his reply brief. Defendant chose instead to ground his argument on Rule 403, which asks whether the probative value of a piece of evidence is substantially outweighed by its unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011). Thus, defendant's present argument regarding the tacit admission rule is forfeited for our review, several times over. The tacit admission rule has been around since the 1860s, if not before. See *Hagenbaugh*

*v. Crabtree*, 33 Ill. 225, 226 (1864) (when one party to a contract asserts a thing to be true concerning that contract in the presence and hearing of the other party, and the other party makes no denial, that is a tacit admission). With a rule this old and well known, we must presume that the decision not to raise it was a strategic one. *People v. Moore*, 279 Ill. App. 3d 152, 159 (1996) (we presume that "[s]ound trial strategy" "embraces the use of established rules"). As such, this issue is forfeited for our review by defendant's failure to argue violation of the tacit admission rule at any time in the court below or in this court, prior to filing his post-briefing motion.

¶ 112    However, even if we overlook defendant's forfeiture—which we do not—we find *Allen* readily distinguishable from the case at bar for a number of reasons. Under the tacit admission rule, a defendant's silence may be introduced as a tacit admission of guilt, if a statement is made that incriminates the defendant, such that the natural reaction of an innocent person would be to deny it, and, instead, the defendant is silent. *Allen*, 2022 IL App (1st) 190158, ¶ 72.

¶ 113    First, the *Allen* court found that no incriminating statement had been made. *Allen*, 2022 IL App (1st) 190158, ¶ 74. In *Allen*, the defendant's mother had stated that he was innocent, providing no reason to object. *Allen*, 2022 IL App (1st) 190158, ¶ 74. By contrast, in the case at bar, the victim's mother's statement was both incriminating and accusatory.

¶ 114    Second, in *Allen*, the trial court found that the defendant's affirmative " 'uh-huh,' " " 'came four seconds too late.' " *Allen*, 2022 IL App (1st) 190158, ¶ 76. The appellate court in *Allen* disagreed because "the recorded conversation shows a freewheeling discussion in which the parties talk over each other." *Allen*, 2022 IL App (1st) 190158, ¶ 76. The phone call in *Allen* involved multiple parties: the defendant, his mother, and his grandmother. *Allen*, 2022

IL App (1st) 190158, ¶ 70. By contrast, in the case at bar, there were only two parties, making any pause clearly attributable to one party or the other.

¶ 115   Third, in *Allen*, the call was placed by defendant from Cook County jail, and the call began with a recorded warning that the call was being recorded and monitored. *Allen*, 2022 IL App (1st) 190158, ¶ 77. In addition, the *Allen* defendant made the call after he had already been arrested and given *Miranda* warnings, including that any statement by him could and would be used against him. *Allen*, 2022 IL App (1st) 190158, ¶ 77. The recorded warning, in addition to the *Miranda* warnings, could have led the *Allen* defendant to pause before speaking. *Allen*, 2022 IL App (1st) 190158, ¶ 77. By contrast, in the case at bar, defendant had not yet been arrested when he was talking to the victim's mother, and he had no notice that the call was being recorded.

¶ 116   Last but not least, *Allen* is distinguishable because it involved a jury trial, whereas the case before us was a bench trial. *Allen*, 2022 IL App (1st) 190158, ¶ 1. In sum, we find that defendant forfeited the issue for our review and that, even if it had not been forfeited, *Allen* is readily distinguishable from the case at bar for a number of reasons and, thus, not persuasive on this appeal.

¶ 117                               III. TV Interview

¶ 118   In his initial appellate brief, defendant objected to certain portions of a TV interview that he claimed were introduced at trial. However, in his reply brief, he stated that he withdrew "this issue from consideration in this appeal."

¶ 119   Typically, when a party withdraws an issue in a reply brief, he or she concedes that the other side is correct or that a subsequent decision has resolved the issue. *People v. McKenzie*, 2013 IL App (1st) 102925, ¶ 34 ("defendant withdrew this argument in his reply brief,

conceding that it was foreclosed by our supreme court's [recent] decision"); *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 1 n.1 (defendant withdrew an argument in his reply brief after the State explained his miscalculation of sentencing credit); *People v. Morrison*, 375 Ill. App. 3d 545, 551 (2007) (defendant withdrew an issue in light of a recent supreme court decision resolving it). Neither occurred here. Although defendant withdrew the issue, he did not concede that the State was correct, and he limited his withdrawal to its "consideration" on "this" appeal, thereby leaving the door open to raising the issue another time. While points not argued are generally forfeited (Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)), forfeiture and waiver are limitations on the parties not the courts. *E.g.*, *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65 ("forfeiture is a limitation on the parties and not the reviewing court" and may be overlooked to obtain a just result). Since this is the third time that defendant has caused this issue to be fully briefed—pretrial, posttrial and on appeal—we exercise our discretion to consider it. We set forth the relevant facts below, so it is clear for future courts that this issue was resolved by the court below and fully considered on appeal.

¶ 120    At trial, the parties stipulated that Goudie was a news reporter for Channel 7 and, if called to testify, he would testify that he interviewed defendant in 1998, that the interview aired in March of that year, and that People's exhibit No. 57 was a true and accurate recording of the interview. The State asked the trial court to enter exhibit No. 57 into evidence and asked for permission "to publish a portion of that interview, an audio portion." The trial court responded, "Please," and a portion was played. However, the appellate record does not indicate the specific portion that was played.

¶ 121    In his initial appellate brief, defendant argued that the trial court erred by admitting hearsay statements by Goudie: (1) that defendant was the police's chief suspect in their

44

investigation of the victim's death, (2) that defendant had been uncooperative with the police investigation, and (3) that the police had told the victim's mother that defendant had killed her son. Defendant also argued that certain statements by Goudie were unfairly prejudicial, where he stated (1) that it was "almost beyond belief that somebody with your background would end up" observing a young boy being pick up by someone else; (2) that "teenage boys don't end up being killed in that manner, or killed period," and (3) that defendant "had a reputation at that point as somebody who enjoyed young boys." However, for the reasons explained below, there is no indication in the record before us that these statements were part of the evidentiary record considered by the trial court.

¶ 122     Prior to trial, the defense moved to exclude the entire interview on the ground that the reporter's questions contained hearsay statements about details of the murder investigation and were unfairly prejudicial. After listening to the parties' arguments on February 10, 2017, the trial court asked the parties to try to agree on what portions of the interview would be admitted at trial. On March 24, 2017, with defense counsel present, the State reported that defense counsel "did forward to us since the last court date highlighted portions of Mr. Goudy's interview with the defendant that he found objectionable. We don't disagree with any of the ones that he brought up, Judge." The State further reported that there was "one question that counsel wanted edited that we don't," but "we will concede we would edit [it] as well." Thus, the record establishes that the parties reached an agreement, as the trial court had requested.

¶ 123     As agreed, only a portion of the interview was played at trial. However, People's exhibit No. 57, which is in the appellate record, contains the full 36-minute interview without any indication of the substance of the parties' agreement.

¶ 124          The parties' closing arguments shed light on what portions were admitted and played. During the State's initial closing argument, the prosecutor mentioned the Goudie interview once, stating:

> "Judge, just a few hours ago, you heard the clips from Chuck Goudie's interview with defendant in 1998. I think [it] kind of ironic that one of the lines that struck me[,] said by the defendant[,] was in reference to David's mother. He said, I think I might have the answer. Of course he does.
>
> He's been providing the answer since 1992, since January 2nd of 1992, and continued to till [*sic*] January, March of 2016, when he admitted to Brad Janikowski his involvement, when he admitted to Andra Williams his involvement.
>
> He also said[,] seek justice. We lose a lot, we never know when [death is] going to take us, that's what he said. No truer words have ever been spoken, Judge."

¶ 125          During defendant's closing argument, the defense used the interview to suggest that it was the interview that prompted Pearson's recollection of a white car on that night:

> "Chuck Goudie interviews him and within three weeks or so, two-and-a-half weeks, Vic Pearson is interviewed by the police, [*sic*] retired officer. This is now after the interview that was done by Chuck Goudie and aired.
>
> Mr. Pearson comes forth about what happened that night—morning between 4:30 and 5:00 a.m. on January 2nd."

¶ 126          The defense raised the interview again as part of its litany of "babbling" statements by defendant that the State had in its possession for years without charging him:

> "[S]ix years later, Chuck Goudie interviews him. Again, it's just more babbling, what he thinks might have happened, what he thinks he's trying to help, what he thinks.

Again, they have it in 1998. Now, we are six years into the case and they're still not charging him."

¶ 127     In the State's rebuttal closing, the prosecutor mentioned the Goudie interview twice, first to argue:

"He tells the [*sic*] Chuck Goudie the guy was smoking a big fat cigar, big fat cigar. By the way, I don't smoke cigars, always trying to remove himself from this phantom offender."

¶ 128     Later in the rebuttal closing, the State argued that the most "damning" comment" in the interview is when defendant says that he "might have the answer" about who killed the victim:

"In 1998 Chuck Goudie interviews the defendant on the street in Vegas, and again the defendant repeats his same story about [the victim] thumbing a ride near the forest preserve **** But the most revealing and damning comment the defendant makes to Chuck Goudie is when Goudie asks him, what would you say to [the victim's parents], and what does he say? I didn't do it. I really don't know for sure who killed your son.

I think I might have the answer, but I'm not sure. All I can say is, I guess, if you could just forgive whoever did this, which I know is a very hard thing to do, but if you can sort of give him, seek justice, but forgive the man. He is haunted by this murder, and he is begging for forgiveness. Not for some unknown offender, for himself."

¶ 129     The closing arguments of the parties do not refer to the statements by Goudie that defendant objected to on appeal.

¶ 130     Despite the parties' pretrial agreement, defendant claimed in his posttrial motion for a new trial that the trial court erred in allowing the interview to be introduced at trial. The motion acknowledged that "some statements were kept out by agreement" but argued that the trial

court "should have excluded the entire interview." Defendant's posttrial motion stated that he was "seeking to keep out the statements of Chuck Goudie" on the ground that they were not admissible as admissions by a party. Defendant argued that "Goudie interjected information into the interview that was hearsay."[14]

¶ 131    At the hearing on defendant's posttrial motion, the trial court stated that it did not consider the parts of the interview "that were not allowed" and, hence, "not played." The trial court stated:

> "The statement[ ] of Chuck Goudie was limited. It wasn't everything. There were
> things that were not allowed and that were not played, and the statements that were not
> allowed, the Court found were too prejudicial. But what was allowed, the Court did
> make findings that they were more probative than prejudicial. Again, they were
> statements from the defendant."

¶ 132    In his initial appellate brief, defendant argued that, although only portions were played at trial, it was possible that the trial court could have listened to and considered the entire tape. We do not find this argument persuasive because, first, the trial court itself rejected the factual underpinning for that argument at the posttrial hearing. Second, the trial court went to some effort to bring the parties to an agreement limiting what it would consider. Third, when the fact finder is the trial court, the court is presumed to consider only admissible evidence only for the purpose for which it was admitted. *Naylor*, 229 Ill. 2d at 603. To the extent that Goudie's

---

[14]In the brief filed in response to defendant's posttrial motion, the State argued to the trial court: "None of this evidence was presented at trial. Additionally, the State worked with the defense to limit the content that would be deemed objectionable by the defense. The defense stipulated to the foundation of the Goudie conversation and agreed to the edited version of the conversation which was properly played in court."

statements and questions were admitted, they were necessary to give context to defendant's responses. Thus, for the foregoing reasons, we do not find this claim persuasive.

¶ 133                            IV. Cell Mates' Testimony

¶ 134        Lastly, defendant argues that the trial testimony of two of his cell mates was unreliable and, hence, inadmissible. The trial court considered these same arguments both pre- and posttrial and found their testimony sufficiently reliable for admission. For the following reasons, we do not find that the trial court abused its discretion in admitting this evidence.

¶ 135        Section 115-21 of the Code governs the admission of informant testimony at trial. 725 ILCS 5/115-21 (West 2018). For purposes of this statutory section, an informant is defined as "someone who is purporting to testify about admissions made to him or by the accused while detained or incarcerated in a penal institution contemporaneously." 725 ILCS 5/115-21(a) (West 2018). As both sides agree, Williams and Janikowski qualified as informants under this definition.

¶ 136        When this definition is triggered, section 115-21 requires a number of safeguards, including (1) the timely disclosure by the State of a list of relevant information and (2) an evidentiary hearing at which the trial court must "determine whether the testimony of the informant is reliable." 725 ILCS 5/115-21(c), (d) (West 2018). In the case at bar, defendant does not claim that the State failed in its duty to disclose information.

¶ 137        At the evidentiary hearing, the State has the burden "to show by a preponderance of the evidence that the informant's testimony is reliable." 725 ILCS 5/115-21(d) (West 2018). "At this hearing, the court shall consider the factors enumerated" in the statutory section, "as well as any other factors relating to reliability." 725 ILCS 5/115-21(d) (West 2018). Thus, this

section leaves the trial court with wide discretion in determining what, if "any," other factors relate to reliability.

¶ 138    Defendant argues that, since the trial court was tasked with applying a statute, our review should be *de novo*. Typically, "[i]ssues of statutory interpretation are subject to *de novo* review." *People v. Stoecker*, 2014 IL 115756, ¶ 21. However, in the appeal before us, the parties do not argue about the meaning of any of the statute's words or requirements. *E.g.*, *Stoecker*, 2014 IL 115756, ¶¶ 20-21 (*de novo* review applied where the State argued that the defendant failed to satisfy a statutory pleading requirement). Rather, the parties before us argue about whether the trial court properly weighed different factors in finding the testimony reliable. The reliability of an informant's testimony is generally reviewed under an abuse of discretion standard. *People v. Belknap*, 396 Ill. App. 3d 183, 213 (2009) (the trial court did not abuse its discretion in permitting jailhouse informants to testify). While "the testimony of jailhouse informants must be viewed with caution," their credibility, "as with any other witness," is generally a question for the jury or fact finder. *People v. Belknap*, 2014 IL 117094, ¶ 55. As a result, we apply the abuse-of-discretion standard of review that is commonly applied to evidentiary rulings. *Caffey*, 205 Ill. 2d at 89. As noted above, "[a]n abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89.[15]

¶ 139    With respect to Williams, defendant argues that his testimony was unreliable because (1) Williams received a reduction in sentence and (2) some of the details of the confession that

---

[15]To support its argument that *de novo* review applies, the defense cites *Petre v. Kucich*, 331 Ill. App. 3d 935, 941 (2002). In *Kucich*, the appellate court explained that it was applying *de novo* review because the facts were undisputed, and the trial court excluded evidence "based solely on its interpretation of case law." *Kucich*, 331 Ill. App. 3d at 941. In the case at bar, defendant does not argue a misinterpretation of case law by the trial court. Thus, we do not find *Kucich* controlling here.

he reported were not corroborated by other evidence. When Williams testified at defendant's trial, Williams had both a pending aggravated criminal sexual abuse case and a separate predatory criminal sexual assault case. Prior to defendant's trial, the State made a seven-year plea offer in the assault case. After defendant's trial, Williams pled guilty in the assault case in exchange for a minimum six-year sentence, which was one year less than the State's prior seven-year offer. In addition, the State dismissed the abuse case.

¶ 140    At the posttrial hearing in the case at bar, the prosecutor stated that he had discussed the dismissal with the assistant state's attorney (ASA) who had handled the abuse case. The ASA in the abuse case reported that the dismissal "had nothing to do" with defendant's case; it occurred because of "the victim's unwillingness to go forward and prosecute."

¶ 141    As for the one-year reduction in the assault case, the State provided a transcript of that plea hearing. At the plea hearing, both the ASA and Williams's counsel confirmed that the plea offer had nothing to do with defendant's case and was due solely to the victim's desire to resolve the case. At the posttrial hearing in the case at bar, the trial court recalled that Williams's attorney was present during Williams's testimony at defendant's trial, and she asked whether this was the same attorney who had been present at Williams's plea hearing. The prosecutor confirmed that it was.

¶ 142    At the end of the posttrial hearing, the trial court observed that statements were made at Williams's plea hearing to the effect that "nothing was given in exchange." The court found that the "information in the plea" did not "negate the findings" that she had previously made that Williams had "testified credibly, reliably." We cannot find an abuse of discretion where the trial court appears to have carefully balanced the posttrial information she received regarding the plea and the dismissal against her prior finding of credibility based on her first-

hand observation and evaluation of Williams's testimony. See *People v. Colon*, 2018 IL App (1st) 160120, ¶ 66 (a reviewing court owes great deference to a trial court's credibility determinations made after observing a witness' "demeanor first-hand"); *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) ("the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony").

¶ 143    Defendant also challenges Williams's credibility arguing that certain details of his testimony were uncorroborated. Defendant argues that, although Williams testified that defendant reported that he and the victim had spoken on the phone a couple of times, the State failed to introduce any phone records to support this claim. However, there is no requirement that the State provide independent and separate corroboration of every detail in a confession. *People v. Lara*, 2012 IL 112370, ¶ 42 (there is no requirement that independent evidence corroborate " '*the details of the confession *** in every particular*' " (emphasis in original) (quoting *People v. Furby*, 138 Ill. 2d 434, 451 (1990))). In addition, T.C.'s testimony shows that the child victim of a sexual predator may try to hide phone conversations from a parent, thereby making it certainly possible that the victim in the case at bar could have avoided use of his parents' landline to hide phone conversations from a parent.

¶ 144    Next, defendant claims that Williams's testimony that defendant reported a struggle was contradicted by the fact that there was no physical evidence of a struggle at the crime scene. Defendant also argues that it defies common sense that, the victim, as he was being choked to death, could ask defendant why he was doing this, as Williams had reported.

¶ 145    As to a struggle, the probability is high that the victim offered some resistance during the two minutes that the pathologist reported it would have taken to suffocate him. The

pathologist testified: "To cause compression of the jugular veins, one needs at least four-and-a-half pounds of pressure that is applied continuously for at least two to two and a half minutes for death to occur." Further, the pathologist testified that the victim's tongue was clenched between his teeth, with markings of the teeth on his tongue. She opined that this clenching could be evidence of a struggle or seizure, and she observed that there were dried leaves buried in the weave of the scarf. Afini, who responded after the victim's body was found, testified that an examination of the victim's face revealed blood "through the nose and mouth" and some bruising. Also, the victim's shoes and outer jacket had been removed, thereby eliminating any evidence of a struggle that they might have revealed, such as blood from either the victim or the murderer or both. When Collett asked defendant about the missing clothing, defendant speculated that the murderer's blood may have been on it. As for the victim's question, Williams's testimony did not indicate at exactly what point during the choking episode that the victim's question occurred. As a result of these facts, we cannot say that the other evidence contradicted these details.

¶ 146    With respect to Janikowski, defendant argues that he received a four-year reduction in sentence and three jail transfers as a result of his cooperation and that he was coerced. Before cooperating, Janikowski, who faced a first degree murder charge, received an offer from the State to plead guilty to second degree murder for a 20-year sentence to be served at 50%. After he began cooperating, and before defendant's trial, the State reduced its plea offer to a 16-year sentence. At 50%, the reduction went from serving 10 years to 8 years.

¶ 147    Janikowski also received three jail transfers and wrote letters stating that he was being harassed by the State. At trial, he testified that he "felt" that the State was "becoming somewhat intimidating and threatening because [he] was having second thoughts about testifying." He

No. 1-20-0072

explained that he "felt that way, yes, because I asked them for help, and they really didn't—didn't seem like they did anything to help me." Janikowski agreed that there had been "no discussion" of "getting [him] help on [his] case." Janikowski wrote a letter to the Illinois Attorney Registration and Disciplinary Commission complaining about the ASA in defendant's case because of the ASA's "lack of help." Janikowski testified that "[n]o one ever told [him] to do anything but tell the truth." On cross examination, Janikowski testified that, although he had felt there was the "potential" for the State to harass him, he had not in fact been harassed. When asked on cross if he felt threatened in prison, he responded: "It's prison. I feel threatened anytime I'm being held by the State***."

¶ 148       In light of this testimony, particularly about the State's lack of help, the State's lack of harassment, and a reduction of only two years in a murder sentence, we are not convinced by defendant's arguments that the alleged help and coercion by the State require a finding that the trial court abused its discretion in admitting Janikowski's testimony. Accordingly, we cannot find that the trial court abused its discretion in concluding, by a preponderance of the evidence, that Williams's and Janikowski's testimony was sufficiently reliable to be admitted at trial.

¶ 149                                    CONCLUSION

¶ 150       In sum, we do not find defendant's claims persuasive and affirm his conviction and sentence.

¶ 151       Affirmed.

¶ 152       JUSTICE MIKVA, specially concurring:

¶ 153       I agree fully with the majority that the trial court carefully and correctly resolved the difficult evidentiary issues in this case and that the conviction should be affirmed. I join the majority opinion except for its conclusion that Mr. Serritella has forfeited his objection to

54

admission of the taped phone conversation between him and the victim's mother on the basis that it was a tacit admission. *Supra* ¶¶ 109-111. I write separately only to explain why I think this conclusion is contrary to established law.

¶ 154   As the majority recognizes, it was the State that argued that the statement by the victim's mother to Mr. Serritella that she thought he had murdered her son was properly admitted "not for the truth of the matter asserted within it, but to show the long pause before defendant responded to it with a denial." *Supra* ¶ 104. Mr. Serritella then responded to this argument in his reply brief, arguing that his pause "was not probative of consciousness of guilt because he continued to maintain his innocence" and that, even if the pause had "minor probative value," the mother's emotional accusation was not necessary to contextualize it. Mr. Serritella then filed a motion to cite *People v. Allen*, 2022 IL App (1st) 190158, as additional authority. In *Allen*, this court addressed a similar conversation in which the State sought to introduce a phone call that included a defendant's silence. The *Allen* court ruled that this silence was not a tacit admission. I agree with the majority that *Allen* is distinguishable and that the admission of the phone call in this case was not reversible error. However, I disagree strongly with any suggestion that Mr. Serritella forfeited his argument on this point.

¶ 155   First, as our supreme court has made clear, a party forfeits issues or claims, not arguments in support of those claims. *Brunton v. Kruger*, 2015 IL 117663, ¶ 76. Mr. Serritella's claim here is that the phone call between him and the victim's mother should not have been admitted into evidence and he has asserted that claim throughout this case.

¶ 156   Moreover, it is always appropriate for an appellant to offer a new argument where that argument is made in response to the appellee's response brief. As our supreme court has made clear:

55

"Supreme Court Rule 341(j) permits appellants to reply to arguments presented in the brief of the appellee. [Citation.] A review of the briefs filed below demonstrates that defendant's double jeopardy argument was presented in reply to the State's assertion that defendant would not be entitled to any credit for the time he spent on probation toward his prison sentence under any circumstances, even if defendant served his entire two-year probation sentence. It would be unfair for us to require an appellant, when writing his or her opening brief, to anticipate every argument that may be raised by an appellee. [Citation.] Thus, we hold that defendant's double jeopardy claim was not forfeited, as it was properly raised in response to the State's argument." *People v. Whitfield*, 228 Ill. 2d 502, 514-15 (2007).

¶ 157    In this case, Mr. Serritella argued in his opening brief that the phone call with the victim's mother was not admissible as it was irrelevant and prejudicial and the mother had no personal knowledge as to who killed her son. In response, the State argued that the phone call was admissible in order to show that Mr. Serritella paused before denying his guilt and that this pause was evidence of his guilt. Although the State did not label it as such, the State's argument was that Mr. Serritella's pause before he replied was a tacit admission of guilt. Mr. Serritella did not forfeit his right to explain why he believed the phone call was not admissible on this basis. There was no forfeiture in this case.

**No. 1-20-0072**

| | |
|---|---|
| **Cite as:** | *People v. Serritella*, 2022 IL App (1st) 200072 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-16880; the Hon. Lauren G. Edidin, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Michael Gentithes, and Ian R. Jackson, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Mary L. Boland, and Stacia Weber, Assistant State's Attorneys, of counsel), for the People. |